IN THE UNITED STATES COURT OF FEDERAL CLAIMS
BID PROTEST

|  |  |  |
|---|---|---|
| PLANETSPACE INC., | ) | |
| | ) | **REDACTED VERSION** |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| THE UNITED STATES, | ) | Case No. _____ |
| | ) | |
| Defendant, | ) | |
| | ) | |

## MEMORANDUM IN SUPPORT OF PLAINTIFF'S APPLICATION FOR A TEMPORARY RESTRAINING ORDER AND MOTION FOR A PRELIMINARY INJUNCTION

Of Counsel:

Jack Y. Chu
**PILLSBURY WINTHROP
SHAW PITTMAN LLP**
1650 Tysons Boulevard
McLean, VA  22102-4859

Robert S. Metzger
**PILLSBURY WINTHROP
SHAW PITTMAN LLP**
725 South Figueroa Street, Suite 2800
Los Angeles, CA 90017-5406
(213) 488-7437
(703) 749-2257 (protected facsimile)

Counsel for Plaintiff
PlanetSpace Inc.

February 18, 2009

## Table of Contents

| | | Page |
|---|---|---|

TABLE OF AUTHORITIES ................................................................................................ ii

STATEMENT OF THE CASE ........................................................................................... 1

QUESTION PRESENTED ................................................................................................. 3

STATEMENT OF FACTS .................................................................................................. 4

A.   History Of ISS Operations And Its Resupply ................................................ 4

B.   NASA Engages The Commercial Space Industry As A Potential Resupply Option ......... 5

C.   CRS Procurement And PlanetSpace Protest ................................................... 8

D.   NASA's February 10, 2009 Override Memorandum ....................................... 9

E.   NASA Continues To Maintain Other ISS Resupply Options Due To CRS's Risks ........ 11

F.   SpaceX and OSC Continue To Receive COTS Funding For Performing CRS Work ........ 12

ARGUMENT ...................................................................................................................... 14

A.   Standard of Review ....................................................................................... 14

B.   PlanetSpace is Likely to Prevail on the Merits Because NASA's Justification For Its CICA Stay Override Is Predicated On A Vast Array Of Factual Inaccuracies And Unsupported Conclusions .................................................................... 15

    1.   Reilly's Standard For CICA Stay Override Decisions ............................. 15

    2.   NASA Mischaracterizes The Potential Adverse Consequences Of Overriding The CICA Stay Because The Future Of The ISS Has Never Been Dependent Upon CRS ................................................................. 18

    3.   NASA Ignores Several Alternatives To CRS In Lieu Of An Override ........ 20

    4.   The Override Memorandum Does Not Establish That NASA Properly Considered The Potential Cost of Proceeding With the Override or Compare Such Costs to the Benefit of Performing the Protested Contracts .............. 23

    5.   NASA Does Not Actually Analyze The Impact Of The Override On Competition And The Integrity Of The Procurement System ...................... 25

C.   Absent Temporary or Preliminary Injunctive Relief, PlanetSpace Will Suffer Significant and Irreparable Harm ................................................................. 27

D.   Temporary or Preliminary Injunctive Relief Will Not Substantially Harm Either the Government or the Intervenors ............................................................... 30

E.   Awarding a Temporary Restraining Order and Preliminary Injunction is in the Public Interest ............................................................................................... 30

CONCLUSION ................................................................................................................... 32

**TABLE OF AUTHORITIES**

<u>Cases</u>                                                                                                                    <u>Page</u>

<u>Aeroplate Corp. v. United States</u>,
    67 Fed. Cl. 1, 2 (2005) ....................................................................................14

<u>Al Ghanim Combined Group Co. v. United States</u>,
    56 Fed. Cl. 502 (2003) ....................................................................................30

<u>CIGNA Government Services, LLC v. United States</u>,
    70 Fed. Cl. 100 (2006) ............................................................................15, 16, 31

<u>E-Management Consultants, Inc. v. United States</u>,
    84 Fed. Cl. 1 (2008) ....................................................................................18

<u>FMC Corp. v. United States</u>,
    3 F.3d 424 (Fed. Cir. 1993)....................................................................................14

<u>Hybritech Inc. v. Abbott Labs</u>,
    849 F.2d 1446 (Fed. Cir. 1988)....................................................................................14

<u>Nortel Gov't Solutions, Inc. v. United States</u>,
    84 Fed. Cl. 243 (2008) ................................................................................ *passim*

<u>PGBA, LLC v. United States</u>,
    57 Fed. Cl. 655 (2003) ....................................................................................15, 31

<u>PlanetSpace Inc.</u>,
    B-401016 (2009) ....................................................................................8

<u>Reilly's Wholesale Produce v. United States</u>,
    73 Fed. Cl. 705 (2006) ................................................................................ *passim*

<u>United States Ass'n of Importers of Textiles & Apparel v. United States</u>,
    413 F.3d 1344 (Fed. Cir. 2005)....................................................................................14

<u>Statutes</u>

5 U.S.C. § 706....................................................................................15

28 U.S.C. § 1491....................................................................................15

31 U.S.C. § 3553....................................................................................1, 16

## MEMORANDUM IN SUPPORT OF PLAINTIFF'S APPLICATION FOR A TEMPORARY RESTRAINING ORDER AND MOTION FOR A PRELIMINARY INJUNCTION

Plaintiff PlanetSpace Inc. ("PlanetSpace") respectfully submits this memorandum in support of its application for a temporary restraining order and motion for a preliminary injunction, both of which have been filed contemporaneously with this memorandum.

### STATEMENT OF THE CASE

This case challenges a February 10, 2009 decision of the National Aeronautics and Space Administration ("NASA" or "Government"), to override the statutory stay of contract performance imposed by the Competition in Contracting Act of 1984 ("CICA"), 31 U.S.C. § 3553(c)(1), in connection with NASA's unlawful award of two (2) International Space Station ("ISS") Commercial Resupply Services ("CRS") contracts to Orbital Sciences Corporation ("OSC") and Space Exploration Technologies Corporation ("SpaceX").

NASA asserts that it needs to override the stay so that two favored suppliers can gain 74 additional days in their efforts to provide resupply services to the International Space Station. NASA contends that the U.S. is at risk of defaulting on its obligations to international partners to support the ISS and that the operations of the station may have to be curtailed or worse. These arguments are contrived and exaggerated.

In contrast, the arguments against the override are compelling and straightforward. NASA cannot prove *any* adverse consequences will attend to continuing the CICA stay. The two companies that NASA so desperately seeks to favor, with cash infusions permitted only if the CICA stay is lifted, are *years* away from qualifying for ISS resupply missions. Both companies confront an imposing array of technical and operational challenges before either can even demonstrate the *potential* to safely perform the Space Station resupply. NASA admits to the

risks ahead for OSC and SpaceX and acknowledges that the schedule set for its "commercial" space initiative is suspect. For that reason, as a matter of record, NASA has identified many and diverse means to keep the ISS resupplied – with or without OSC or SpaceX. No override is necessary.

The CICA override is a device for NASA to frustrate the PlanetSpace bid protest pending before the GAO and circumscribe the range of corrective measures as the GAO may direct should it sustain the protest. No doubt, should the override remain in effect, there will be an adverse impact on competition. That is presumably what NASA intends. NASA wants to put its favored suppliers out of reach of their competition, PlanetSpace. The override determination, obviously strained and overreaching, only illustrates the lengths to which NASA will go to have its way – regardless of CICA and regardless of the merits of the PlanetSpace protest before the GAO.

NASA's decision to override the CICA stay posits that the future viability of the ISS Program will succeed or fail solely on the progress of recently-awarded CRS contracts (and SpaceX's and OSC's performance thereof). Such mischaracterizations are belied by NASA's consistent public position that because CRS is a new endeavor and full of inherent risks, NASA must maintain the flexibility to rely on several alternatives to CRS after the planned retirement of the Space Shuttle program in 2010.

In its override decision, NASA is unconvincing in its effort to assign long-term dire consequences to the 74 days which remain before the GAO is due to resolve the PlanetSpace Protest. It has conjured up potential long-term problems, to be sure, but failed completely to make a causal connection between the 74 days – and *anything* that either SpaceX or OSC could accomplish in that period – and these problems. Further, NASA has conveniently ignored or

2

improperly disregarded several alternative ISS resupply options, well known to it as a matter of record, which are viable *short-term* solutions in lieu of the override.  Instead, NASA considers the irrelevant question of whether such alternatives are sufficient as *long-term* replacements for the CRS contracts.  Finally, the Override Memorandum also purports to but does not actually analyze the impact of the stay override on competition and procurement integrity.  For these reasons, PlanetSpace respectfully submits that the Court should set aside the override decision as void.  Moreover, because the override will cause irreparable harm to PlanetSpace that significantly outweighs any harm to the Government from the award of equitable relief, PlanetSpace's application for a temporary restraining order and motion for a preliminary injunction should be granted.

## QUESTION PRESENTED

Whether PlanetSpace is entitled to a temporary restraining order (pending the issuance of a preliminary injunction), a preliminary injunction (pending the entry of final judgment in this case), or declaratory judgment to prevent NASA from carrying out its arbitrary, capricious, and otherwise unlawful decision to override the stay of contract performance imposed by CICA when PlanetSpace timely filed a bid protest at GAO challenging the unlawful award of ISS CRS contracts to OSC and SpaceX?

## STATEMENT OF FACTS

**A.    History Of ISS Operations And Its Resupply**

The International Space Station program (the "ISS Program") began in 1993 with an international partnership comprised of the United States, Russia, Canada, the members of the European Space Agency, and Japan.  Testimony of Cristina T. Chaplain, Director of Acquisition and Sourcing Management, U.S. Government Accountability Office, "Challenges in Completing and Sustaining the International Space Station," GAO-08-581T, before the House Committee on Science and Technology, Subcommittee on Space and Aeronautics at 3 (Apr. 24, 2008) ("GAO Testimony"), available at http://www.gao.gov/new.items/d08581t.pdf.  The ISS serves as a space laboratory for conducting commercial, scientific, and engineering research.  Id.

Humans have staffed the ISS since November 2000, and as of July 2006, 17 NASA Space Shuttle flights and 36 Russian Soyuz and Progress[1] flights have been launched to assemble, maintain, and provide crew transportation and consumables.  Final Report of the International Space Station Independent Task Force at 8 (Feb. 2007) ("IISTF Report"), available at http://www.nasa.gov/pdf/170368main_IIST_%20Final%20Report.pdf.  The Space Shuttle can lift and return more cargo than any other current or planned space vehicle.  GAO Testimony at 4.  NASA has developed a manifest consisting of approximately 17 Space Shuttle launches to support ISS assembly and resupply between 2005 and 2010.  Id. at 5.  Nonetheless, NASA currently plans to cease the Space Shuttle program on September 30, 2010, six years before the currently scheduled retirement of the ISS in 2016.  Id.

---

[1] Soyuz is the manned spacecraft which is used to carry crew to and from the ISS.  The Progress is an unmanned, automated cargo resupply spacecraft.

**B.     NASA Engages The Commercial Space Industry As A Potential Resupply Option**

The 2005 NASA Authorization Act directed NASA to develop a plan to increase the utilization of the ISS by other federal entities and the private sector.  GAO Testimony at 5. NASA established a Commercial Crew and Cargo Program to stimulate the commercial space industry and facilitate private industry's demonstration of cargo and crew space transportation services, also known as the Commercial Orbital Transportation Services ("COTS") project. Rocketplane Kistler, B-310741, 2008 CPD ¶ 22 at 1-2 (Jan. 28, 2008).  The COTS project entailed a two-phase approach, the first of which was a "period of development and demonstration" by private industry of their space transportation capabilities ("Phase 1").  Id. at 2. The second phase ("Phase 2") would be a planned competitive procurement of orbital transportation services to resupply the ISS with cargo and crew, and is the same CRS procurement at issue in PlanetSpace's underlying GAO protest.

Both SpaceX and OSC received NASA-funded COTS demonstration contracts in the form of Space Act Agreements (the "SpaceX COTS Contract" and "OSC COTS contract," respectively).[2]  Under SpaceX's COTS demonstration contract, SpaceX will receive $278 million from NASA to develop and demonstrate vehicles, systems, and operations needed for SpaceX to perform earth to orbit space flight demonstration of (1) external cargo delivery and disposal, (2) internal cargo delivery and disposal, (3) internal cargo delivery and return to earth,

---

[2] Copies of the SpaceX and OSC COTS contracts are available at http://www.nasa.gov/centers/johnson/pdf/162330main_SPACE_ACT_AGREEMENT_FOR_CO TS.pdf and https://www.nasa.gov/centers/johnson/pdf214893main_Orbital_COTS_Ph1_Redacted_SAA_2_ 27-08.pdf, respectively.  The amendments thereto are available at http://www.nasa.gov/centers/johnson/pdf/216459main_spacex_amend_2.pdf and http://www.nasa.gov/centers/johnson/pdf/284646main_Orbital%20Amendment%201.pdf, respectively.

and (4) crew transportation. See SpaceX COTS Contract at 2; "Commercial Orbital Transportation (COTS) Status" Slides (the "Logsdon Presentation") at 3 (Feb. 5, 2009) (listing SpaceX milestone payments), available at http://www.hq.nasa.gov/office/oer/nac/NACPresentations/Feb_09/EC2_COTS_LOGSDON.ppt. Similarly, under the OSC's COTS demonstration contract, OSC will receive $170 million from NASA to develop and demonstrate vehicles, systems, and operations needed for OSC to perform earth to orbit space flight demonstration of (1) external cargo delivery and disposal, and (2) internal cargo delivery and disposal. See OSC COTS Contract at 2; Logsdon Presentation at 5. As part of these demonstrations, NASA will provide the ISS as an orbital destination and active test bed for both SpaceX and OSC. See SpaceX COTS Contract at 2; OSC COTS Contract at 2.

Despite its investment in COTS and the CRS procurement, NASA has publicly admitted on multiple occasions that CRS contains risks and delays in the project are inevitable. Consistent with NASA's concerns, the IISTF's February 2007 report has observed that the "[d]esign, development, and certification of a new COTS capability are just beginning . . . [and] most likely will take much longer than expected and will cost more than anticipated." IISTF Report at 59. More importantly, the IISTF observed regarding COTS that "in addition to the technical challenge . . . [the IISTF] sees no evidence of an integrated resource plan for these proposed vehicles in support of the ISS's mission. This suggests that there is *significant risk* in being able to rely on COTS support to meet the initial anticipated logistics demand in a post-Shuttle logistics delivery requirement." Id. (emphasis added).

Thus, the IISTF recommended that the ISS Program "should not be required to commit the ISS to an unproven logistics support system such as COTS," and to "ensure that it is not forced into dependency on an unproven capability, the Program should procure additional spare

proven capability to assure a smooth transition to unproven capabilities later. . . ." Id.  Similarly, the GAO has reported that NASA officials have acknowledged that their development schedules leave little room for the unexpected, and cited the February 2007 IISTF Final Report's observations in concluding that NASA's schedule for COTS is "optimistic" in comparison to other government and commercial space programs.  GAO Testimony at 17-19.

The admissions from NASA officials that GAO cited included testimony on July 24, 2007 before the House Committee on Science and Technology, where Tommy Holloway, former manager of the ISS Program for NASA's Johnson Space Center (and chairman of the IISTF) stated that "it would be unlikely that COTS will be able to provide a substantial part of the logistics program in the most critical period following retirement of the [space] shuttle program." "Task Force Doubts COTS Firms' Timelines For Station Resupply," SPACE NEWS (Aug. 9, 2007), available at http://www.space.com/spacenews/archive07/shuttleissues_0730.html.  Mr. Holloway also expected that it would be "several years after that before routine commercial activities are viable." Id.

At the same hearing, William Gerstenmaier, the Source Selection Authority for the CRS procurement at issue in PlanetSpace's underlying GAO protest, similarly admitted that NASA was not betting the future of the ISS on the success of COTS, and that NASA would take a multi-pronged approach of lining up agreements to use European, Japanese, and Russian resupply systems for the ISS after the planned 2010 Space Shuttle retirement.  Id.

Michael D. Griffin, NASA's most recent Administrator, further testified before the U.S. Senate Committee on Commerce, Science & Transportation, Subcommittee on Space, Aeronautics, and Related Sciences, on November 15, 2007, that "[a]pproaches to acquiring further [JAXA] HTV cargo delivery services, particularly in the area of non-pressurized system

spares, are under evaluation in the event that COTS cargo services are delayed.  If system

sparing becomes critical to maintaining the station and U.S. commercial cargo services are

delayed, it would be prudent to have the flexibility to execute a sound contingency plan."

### C.    CRS Procurement And PlanetSpace Protest

As part of Phase 2 of the COTS project, NASA issued Solicitation No. NNJ08ZBG001R

(the "Solicitation") on April 14, 2008, which sought proposals for a space transportation services

contract to supply cargo to the ISS for a period of seven years, through December 31, 2015.  The

Solicitation stated that NASA may elect to award multiple award contracts, and that the

maximum value of each contract was $3.1 billion.  The Solicitation defined NASA's

requirements for a contractor to provide resupply service to the ISS, dispose of unneeded cargo,

and to return cargo from the ISS back to NASA.

PlanetSpace timely submitted its offer in response to the Solicitation.  PlanetSpace

proposed a launch solution relying on the combined expertise of Alliant Techsystems ("ATK"),

The Boeing Company ("Boeing") and Lockheed Martin Corporation ("Lockheed Martin").  On

September 8, 2008, NASA notified PlanetSpace that NASA had included PlanetSpace's proposal

in the competitive range.  After conducting discussions, NASA invited PlanetSpace to submit a

Final Proposal Revision, which revision PlanetSpace submitted on November 10, 2008.  On

December 23, 2008, NASA notified PlanetSpace that NASA had selected SpaceX and OSC for

CRS contract awards.

After NASA debriefed PlanetSpace on January 9, 2009, PlanetSpace protested the

contract awards to SpaceX and OSC at the GAO on January 14, 2009.  See Protest of

PlanetSpace Inc., B-401016.  PlanetSpace's GAO protest triggered an automatic stay of

performance of the CRS contracts.  Nearly a month later, on February 9, 2009, NASA issued a memorandum (the "Override Memorandum," attached hereto at Exhibit A) advising that its Assistant Administrator of Procurement and Head of Contracting Activity for the ISS Cargo Resupply had approved an override of the CICA stay on the CRS contracts.

### D.   NASA's February 10, 2009 Override Memorandum

The Override Memorandum, after providing a background summary of the ISS program and the CRS procurement, contains a "Justification To Continue Performance" section that was divided into four subsections.  Exhibit A at 3-7.  These four subsections are titled "Significant Adverse Consequence," "Reasonable Alternatives," "Cost-Benefit Analysis," and "Impact on Competition and the Integrity of the Procurement System."[3]

First, under the "Adverse Consequence" subsection, the Memorandum states that a 100-day delay due to the automatic stay will result in a direct and adverse impact on the ability of SpaceX and OSC to meet their December 2010 and October 2011 launch dates, respectively.  Id. at 4-5.  Activities allegedly impacted by a 100-day delay include detailed mission integration planning, development of software, development of qualification data, capital equipment and long-lead item purchases.  Id. at 5.  The Memorandum also alleges that failure to meet the above launch dates will result in a failure to resupply the ISS with mission critical cargo and reduction of the ISS to a skeleton crew.  Id.  Further, the Memorandum alleges in the subsection that any delay in performance of the CRS contracts would mean that the United States will not be able to

---

[3] These four subsections of the Override Memorandum appear to reflect NASA's attempt to satisfy the four-prong test set forth in Reilly's Wholesale Produce v. United States, 73 Fed. Cl. 705, 711 (2006), which prongs this Court has consistently required a procuring agency to consider in justifying a CICA stay override determination.

fulfill its international agreements and such a failure would adversely impact the future of further international space exploration initiatives. Id.

Second, under the "Reasonable Alternatives" subsection, the Memorandum states that no reasonable alternative sources exist to meet NASA's requirement to supply the ISS once the Space Shuttle is retired as a means for resupplying the ISS. Id. Although NASA had previously used Russian vehicles to resupply the ISS as an alternative to the space shuttle, the Memorandum alleges that NASA does not currently have any agreements to use Russian vehicles for ISS resupply services. Id. at 6. Moreover, the Memorandum states that use of Russian vehicles is not consistent with NASA's commitment to support domestic commercial space efforts and contrary to U.S. space policy. Id.

Third, under the "Cost-Benefit Analysis" subsection, the Memorandum states that proceeding with the override will result in the benefit of ensuring that the ISS timely receives cargo for its continued operation. Id. By contrast, the Memorandum alleges that a sustained GAO protest would result in a potential termination liability of $20 million, which amount representing $10 million in funding through May 2009 each for SpaceX and OSC. Id. at 7.

Fourth, under "Impact on Competition and the Integrity of the Procurement System," the Memorandum concludes without explanation that the benefits of a stay override outweigh the impact of the override on the procurement process, and that the override will not eliminate PlanetSpace's opportunity to compete for the CRS contracts should the GAO recommend re-competition as corrective action in PlanetSpace's underlying protest. Id.

Based on its stated analysis, the Override Memorandum finds that "urgent and compelling circumstances exist that will significantly and adversely affect the interests of the

U.S. unless the agency authorizes contract performance, notwithstanding the [PlanetSpace GAO] protest." Id. at 8.

### E.   NASA Continues To Maintain Other ISS Resupply Options Due To CRS's Risks

NASA currently has the legal authority to pursue Soyuz and Progress resupply services from Russia through the year 2016.  At one point, it had appeared that NASA's continued purchase of resupply services from Russia may be in jeopardy once Congress passed the Iran Non-Proliferation Act of 2000, which Act contained provisions that would place restrictions on NASA's ability in the future to procure Progress and Soyuz ISS resupply services from Russia. See "Bush Signs NASA Budget, Soyuz Waiver Into Law," SPACE NEWS (Oct. 2, 2008), available at http://www.space.com/news/081002-nasa-soyuz-waiver.html.  Subsequently, however, Congress enacted an amendment in 2005 that extended the exemption for the ISS program from such restrictions through 2011.  Id.  In September 2008, President Bush signed into law a provision that extended the Non-Proliferation Act exemption for Progress and Soyuz through 2016. Id.

In addition to the potential use of Russian resupply vehicles, as noted in both the February 2007 IISTF Final Report and April 2008 GAO testimony to Congress on the IIS, the European ATV and Japanese HTV are available options for ISS resupply.  IISTF Report at 57-58; GAO Testimony at 14-16.

Furthermore, if NASA were to postpone the planned 2010 retirement of the Space Shuttle, it would not need to rely solely on COTS.  A NASA study conducted in early 2009 has already considered extending Space Shuttle operations either to 2012 or 2015.  See "Shuttle

Extension Options Have Common Denominator:  High Cost," SPACE NEWS (Jan. 6, 2009),
available at http://www.space.com/news/090106-sn-space-shuttle-extension-costs.html.

Lastly, in a similar vein, NASA has indicated that if delays in the progress of CRS occur,
it will rely on prepositioned spares to be sent up to the ISS before the Shuttle retires.  See
"Hearing Charter, NASA's International Space Station Program:  Status and Issues" Before the
H. Comm. on Science and Technology, Subcomm. on Space and Aeronautics, 110th Cong.
(2008), available at
http://democrats.science.house.gov/Media/File/Commdocs/hearings/2008/Space/24apr/Hearing_
Charter.pdf.  In particular, NASA's Associate Administrator for Space Operations stated that
NASA has "recognized that there may be a little bit of a delay in the delivery of those
[commercial] services," adding that "[o]ur plan is that if we have a delay we would live off the
spares we flew up on shuttle and take some limited degradation in space station capabilities until
those commercial services come on line." Id.

F.    **SpaceX and OSC Continue To Receive COTS Funding For Performing CRS
       Work**

The Taurus II launch vehicle and Cygnus orbital transfer vehicle that OSC is currently
developing under its Phase 1 COTS contract constitute the same system components that OSC
plans to utilize for its Phase 2 performance under the CRS contract.  Compare Logsdon
Presentation at 4 (describing OSC COTS System) with "Commercial Orbital Transportation
Services (COTS)/Commercial Resupply Service (CRS)" (describing Orbital's planned
development of the Taurus II and Cygnus), available at
http://www.orbital.com/HumanSpaceExplorationSystems/COTS/PrinterFriendly.shtml (last
visited Feb. 12, 2009).  As of November 2008, OSC has received $60 million of the $170 million

funded for its Phase 1 COTS demonstration contract.  The $60 million that OSC has already

received from NASA includes funding for, *inter alia*, its Demo Mission System Requirements

Review and Unpressurized Cargo Module Preliminary Design Review.  See Logsdon

Presentation at 5; OSC COTS Contract, Appendix 1 at 2-3.

Most recently, under its COTS contract, OSC has received or will receive $20 million in

February 2009 to conduct a COTS System Preliminary Design Review for the purpose of

demonstrating to NASA that OSC's preliminary design meets all system requirements with

acceptable risk, and establishing that OSC may proceed with its detailed design.  OSC COTS

Contract, Amendment 1 at 1; see also Logsdon Presentation at 5.  In March 2009, OSC will also

receive $10 million under its COTS contract to conduct a Critical Design Review for its

Unpressurized Cargo Module.  OSC COTS Contract, Amendment 1 at 2; see also Logsdon

Presentation at 5.

Similarly, the Falcon 9 launch vehicle and Dragon maneuvering spacecraft that SpaceX is

currently developing under its Phase 1 COTS contract constitute the same system components

that SpaceX plans to utilize for its Phase 2 performance under the CRS contract.  Compare

Logsdon Presentation at 2 (describing SpaceX COTS System) with "F9/Dragon Will Replace the

Cargo Transport Function of the Space Shuttle after 2010," (press release describing SpaceX's

CRS contract award), available at http://www.spacex.com/press.php?page=20081223 (last

visited Feb. 12, 2009).  As of December 2008, SpaceX has received $224 million of the $278

million funded for its Phase 1 COTS demonstration contract.  The $224 million that SpaceX has

already received from NASA includes funding for, *inter alia*, System Requirements Reviews and

Preliminary Design Reviews of SpaceX's first flight of Dragon and procedures for its

rendezvous and berthing with the ISS. See Logsdon Presentation at 3; SpaceX COTS Contract, Appendix 1 at 2-3.

Most recently, under its COTS contract, SpaceX will receive $15 million in March 2009 to conduct a Demonstration Readiness Review that ensures SpaceX's demonstration flight hardware and software, ground facilities, end-to-end communication systems, support personnel, and procedures are ready for flight testing and data acquisition, reduction, and control. SpaceX COTS Contract, Amendment Two at 5; see also Logsdon Presentation at 3.

## ARGUMENT

### A. Standard of Review

In considering PlanetSpace's motion for preliminary injunctive relief, this Court must weigh the following four factors: (1) PlanetSpace's likelihood of success on the merits; (2) the immediate and irreparable injury to PlanetSpace; (3) the public interest; and (4) the balance of the hardships on all the parties. See United States Ass'n of Importers of Textiles & Apparel v. United States, 413 F.3d 1344, 1347-48 (Fed Cir. 2005); Aeroplate Corp. v. United States, 67 Fed. Cl. 1, 2 (2005). No single factor is determinative, and the "weakness of the showing regarding one factor may be overborne by the strength of the others." FMC Corp. v. United States, 3 F.3d 424, 427 (Fed. Cir. 1993); see also Hybritech Inc. v. Abbott Labs., 849 F.2d 1446, 1451 (Fed. Cir. 1988) ("These factors, taken individually, are not dispositive; rather, the...court must weigh and measure each factor against the other factors and against the form and magnitude of the relief requested.").

Applying these factors to the circumstances of this case, PlanetSpace is entitled to injunctive relief.

14

**B.      PlanetSpace is Likely to Prevail on the Merits Because NASA's Justification
         For Its CICA Stay Override Is Predicated On A Vast Array Of Factual
         Inaccuracies And Unsupported Conclusions**

PlanetSpace is likely to prevail on the merits of its claim that NASA's recent

determination to override the CICA stay of performance on the ISS CRS contracts contravenes

the standards set forth in the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2).[4]

Under those standards, the Court must overturn the procuring agency's override decision

if it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

CIGNA Gov't Servs., LLC v. United States, 70 Fed. Cl. 100, 109 (2006) (citing the APA, 5

U.S.C. § 706(2)(A)). "In order to prevail, the protestor must show by a preponderance of the

evidence that the agency's actions were either without a reasonable basis or in violation of

applicable procurement law." Id. at 109-10. An agency's override decision may lack a

reasonable basis if the agency considered factors that were irrelevant or ignored factors that were

relevant. Id. at 110 (citing PGBA, LLC v. United States, 57 Fed. Cl. 655, 664 (2003)). For

reasons detailed below, NASA's decision to override the CICA stay here, based on a finding of

"urgent and compelling circumstances," lacks a reasonable basis and is therefore arbitrary,

capricious, and contrary to law.

**1.      Reilly's Standard For CICA Stay Override Decisions**

When an offeror files a bid protest at GAO within the statutorily prescribed time frame,

CICA imposes a mandatory stay of contract performance. 31 U.S.C. § 3553(d)(3)(A). If the

contractor has begun performance, the agency must "immediately direct the contractor to cease

---

[4] Although the instant action does not arise under the APA, the APA provides the
applicable standard of review for this Court. See 28 U.S.C. § 1491(b)(4) ("[i]n any action under
this subsection, the courts shall review the agency's decision pursuant to the standards set forth
in section 706 of title 5").

performance under the contract and to suspend any related activities that may result in additional

obligations being incurred by the United States under that contract." 31 U.S.C. §

3553(d)(3)(A)(ii).  The agency may not authorize the contractor to resume performance while the

protest is pending.  31 U.S.C. § 3553(d)(3)(B).

Here, the head of NASA's contracting activity may override a CICA-mandated stay in

contract performance upon a written determination that:

(i)    performance of the contract is in the *best interests* of the United States; or

(ii)   *urgent and compelling circumstances* that significantly affect the interests of the
       United States will not permit waiting for the decision of the Comptroller General
       concerning the protest.

31 U.S.C. § 3553(d)(3)(C)(i) (emphasis added).  See also CIGNA Gov't Servs., 70 Fed. Cl. at

110.

This Court has ruled that in preparing the justification underlying its CICA stay override

decision, the Government must at least consider:  (1) whether significant adverse consequences

will necessarily occur if the stay is not overridden; (2) whether reasonable alternatives to the

override exist that would adequately address the circumstances presented; (3) how the potential

cost of proceeding with the override, including the costs associated with the potential that the

GAO might sustain the protest, compare to the benefits associated with the approach being

considered for addressing the agency's needs; and (4) the impact of the override on competition

and the integrity of the procurement system, as reflected in CICA.  Reilly's Wholesale Produce

v. United States, 73 Fed. Cl. 705, 711 (2006).[5]

---

[5] In Reilly's, the procuring agency, which operated commissaries for the military,
initially awarded a contract that the plaintiff protested at the GAO.  73 Fed. Cl. at 706.  Per
CICA, that initial contract was stayed and the agency issued a nearly identical interim contract

16

Although NASA's Override Memorandum purports to address these four factors, as explained below, the Memorandum is predicated on incomplete and misleading characterizations of the ISS Program's future development as dependent solely on the undisturbed performance of the CRS contract after the planned Space Shuttle retirement in 2010. On the contrary, NASA has consistently admitted that the CRS option contains risks and that delays in the project are inevitable. Thus, Override Memorandum reaches unsupported conclusions about the adverse consequences that would allegedly occur if the stay is not overridden because NASA has always considered backup options for ISS resupply if the CRS program were delayed for any reason. Just as importantly, the Override Memorandum contains a litany of inaccuracies and omissions about whether there are reasonable alternatives to CRS for ISS resupply and whether the availability of such alternatives warranted NASA's stay override determination.[6] The Override Memorandum also purports to but does not actually analyze the impact of the stay override on competition and procurement integrity. For these reasons, the override decision is arbitrary and capricious, and PlanetSpace is likely to prevail on the merits.

---

rather than override the stay, because the agency conceded that it lacked sufficient justification for a stay override. Id. at 706-07. The plaintiff again protested the interim contract at the GAO, and performance on the interim contract was stayed. Ultimately, the agency decided to override the stay of the interim contract and the plaintiff filed a CICA stay override suit in this Court, seeking preliminary injunctive relief. Id. at 707-08. This Court ruled that the agency's CICA stay override decision was arbitrary and capricious because, *inter alia*, the circumstances underlying the purported urgency of the agency's override decision were a result of the agency's lack of advance planning. Id. at 715. This Court granted preliminary injunctive relief to the plaintiff and enjoined the Government from further performance of the contracts. Id. at 717.

[6] NASA asserts unequivocally that "[n]o reasonable alternative sources exist to meet NASA's requirements to resupply the ISS once the Space Shuttle retires." Exhibit A at 5. NASA officials have said otherwise, publicly. To sustain an override decision, an agency must "not only sort between the relevant and irrelevant factors, but must also render findings with respect to those that are relevant that do not 'run counter to the evidence before the agency.'" Nortel Gov't Solutions, Inc. v. United States, 84 Fed. Cl. 243, 250 (2008) (citing Reilly's Wholesale Produce, 73 Fed.Cl. at 711).

2. **NASA Mischaracterizes The Potential Adverse Consequences Of Overriding The CICA Stay Because The Future Of The ISS Has Never Been Dependent Upon CRS**

PlanetSpace has never disputed that NASA is committed to sustaining the commercial space industry's involvement in the ISS Program, and PlanetSpace has always been completely invested itself in the future success of CRS as one of NASA's post-Shuttle resupply options. Nonetheless, in its Override Memorandum, NASA disingenuously portrays the future viability of the ISS Program as somehow completely dependent upon the undisturbed performance of the CRS contracts. As demonstrated in the Statement of Facts, NASA has never adopted such a myopic, single-prong policy for its operation of the ISS, and the Override Memorandum cannot cite any evidence to the contrary. Thus, the Override Memorandum fails to satisfy factor (1) of the Reilly's test, which requires a showing that significant adverse consequences will necessarily occur of the stay is not overridden.

First, the Override Memorandum lists the potential CRS mission delays that may occur due to a CICA stay, but does not actually show that adverse consequences will "necessarily" result from a stay of performance. In E-Management Consultants, Inc. v. United States, 84 Fed. Cl. 1 (2008), this Court found that the override memorandum at issue failed to satisfy factor (1) of the Reilly's test and declared the procuring agency's stay override as void, because the agency merely listed possible adverse consequences without establishing that they would "necessarily occur" (emphasis in original). Thus, as a threshold matter, NASA's discussion of adverse consequences is legally deficient.

Second, NASA officials have consistently recognized that despite their commitment to COTS and CRS, there are inherent risks in such an unprecedented endeavor. The Override Memorandum itself concedes that "[n]ew space vehicle production is a high risk enterprise with

18

a high probability of delay." Override Memorandum at 4. While NASA would have the Court believe that the risks in the CRS endeavor warrant unstayed contract performance by SpaceX and OSC, the existence of such risks is actually consistent with NASA's public position that maintaining alternative ISS resupply options to CRS is essential. In other words, NASA has never suggested that the viability of the ISS depends solely on whether CRS succeeds or fails. Because NASA has always adopted a multi-prong approach to ISS resupply, the "parade of horribles" that the Override Memorandum implies would occur absent the stay override are, at best, conclusory observations that lack any support.

Third, as demonstrated in the Statement of Facts, because SpaceX and OSC continue to perform their COTS contracts and receive funding for efforts that either overlap with or directly support milestones for the CRS contract, NASA's contention that SpaceX and OSC would be unable to conduct the "critical initial activities" set forth in the Override Memorandum is dubious at best. On the contrary, NASA's own presentation slides demonstrate that SpaceX and OSC have together received hundreds of millions of dollars for apparently meeting milestones related to the design and development of the same launch vehicles and maneuvering spacecrafts that they plan to use for performance of their CRS contracts. By claiming that a delay of just over two months will impact the ability of either SpaceX or OSC to perform the CRS mission, NASA "conflates" the remaining (and already funded) obligations under the COTS contracts with the prospective requirements of CRS.

Finally, NASA's reliance on the potential, *long-term* adverse consequences of delayed performance due to a CICA-stay is puzzling if not paradoxical in a memorandum purportedly

19

justifying the *urgent* (i.e., short-term) and compelling circumstances for an override.[7]  Assuming *arguendo* that a continued stay of CRS contract performance was the only direct cause (as opposed to the risks that NASA has conceded are inherent in CRS) of a delayed availability of CRS to the ISS in December 2010, as explained in the Statement of Facts and below, NASA has several alternative options (e.g., Shuttle extension, procurement of Russian resupply services) for bridging what would be at worst a short-term delay in CRS due to the CICA stay.  In any event, given all the technical obstacles and risks that confront SpaceX and OSC before they are ready to perform an ISS resupply mission, NASA cannot show a "but for" relationship between the CICA-mandated stay and the achievement of the needed capabilities.  At most, NASA can speculate that the extra 74 days might make a difference, but that is far from the satisfying the legal requirement that "significant adverse consequences *will occur* if the stay is not overridden." Nortel, 84 Fed. Cl. at 248 (emphasis added).  In other words, NASA cannot establish a causal relationship between lifting the stay and avoiding the harm that it posits.

In summary, if this Court were to enjoin performance of the CRS contracts and permitted the CICA stay to remain in effect during the pendency of PlanetSpace's GAO protest (i.e., until April 24, 2009 at the latest), no significant adverse consequences (if any) would necessarily occur.  The Override Memorandum is wholly deficient on this prong of the Reilly's test.

### 3.    NASA Ignores Several Alternatives To CRS In Lieu Of An Override

In issuing the formal override, NASA did not properly consider whether reasonable alternatives to the override existed that would adequately address the circumstances of stayed

---

[7] Moreover, if circumstances were truly "urgent" for undisturbed CRS contract performance, one would not have expected NASA to wait nearly a month after the filing of PlanetSpace's GAO protest to issue a stay override.

CRS performance, as required in factor (2) of the Reilly's test.  In fact, there were several alternatives to simply directing continued performance of both the SpaceX and OSC contract – none of which NASA considered because the Override Memorandum again makes the mistake of addressing the irrelevant issue of whether there are long-term alternatives to CRS for the ISS, when the proper inquiry is whether there are alternatives to an override in addressing any short-term effects of a CICA stay.

For example, NASA dismisses the possibility of using Russian vehicles to resupply the ISS as an alternative to the stay override because procurement of such Russian services "is not consistent with NASA's commitment to Congress to support domestic commercial space efforts and contrary to U.S. space policy. . . ."  That NASA has a preference not to use Russian vehicles for resupply is understandable and commendable, but as a legal matter there is no obstacle whatsoever to NASA entering into a contract with Russia for Progress resupply in time to avoid any "gap" in ISS in the near-term before COTS or CRS suppliers are likely to become available. Moreover, apart from the fact that the most recent NASA funding legislation now permits NASA to procure Soyuz and Progress services from Russia through the year 2016 if necessary, NASA officials have never stated (nor is PlanetSpace suggesting now) that NASA should be using Russian vehicles as its main, long-term option for ISS resupply.  On the contrary, NASA has recognized that if delays in the development of CRS occur due to the inherent risks of such new technologies, it is acceptable (if not completely necessary) to rely on other ISS resupply options as a short-term solution – including the procurement of Russian vehicles.

Similarly, the issue of whether the European ATV and the Japanese HTV are sufficient to meet the long-term cargo support needs of the ISS, as discussed in the Override Memorandum, is irrelevant to the question of whether NASA's short-term reliance on ATV and HTV would be a

21

reasonable alternative to the stay override. The Override Memorandum does not attempt to address the latter (and more relevant) inquiry, and instead summarily dismisses the ATV and HTV as resupply alternatives. On the other hand, the IISTF Final Report, the GAO's reporting on post-Shuttle ISS resupply, and NASA officials have all indicated that the ATV and HTV should be considered as short-term options if NASA cannot meet its CRS launch dates for SpaceX and OSC in 2010 and 2011, respectively.

Further, as discussed in the Statement of Facts, a fourth reasonable alternative that NASA either overlooked or ignored before authorizing CRS performance is extending the Space Shuttle program on a short-term basis, an option that the evidence suggests NASA has studied very recently, but is never mentioned in the Override Memorandum. Lastly, NASA itself has admitted that the use of prepositioned spares is an option that may be pursued if the CRS option encounters performance delays, as is possible if not likely.

In short, NASA has acknowledged, publicly and repeatedly, that it has a variety of options available to it, and contingency plans, to resupply the ISS should there be delay in the availability of commercial resupply services. Indeed, NASA has the ability to resupply the ISS throughout the period of its operation, as planned through 2015 or longer (if extended), without *any* use of commercial launch providers in the eventuality that both of the COTS suppliers may fail. Having recognized the unavoidable risks of commercial development of entirely new launch vehicles and orbital transfer vehicles, at no time has NASA "put all its eggs" in the basket of either COTS or CRS. Existing international partners can fill any ISS gap, should one arise, and the new Administration may even order one or two additional Shuttle missions. For these reasons, NASA cannot credibly maintain – given the Override Memorandum's narrow analysis

22

and the facts at hand – that in overriding the stay of the CRS contracts, it properly considered and evaluated all the reasonable alternatives to the override.

> **4.    The Override Memorandum Does Not Establish That NASA Properly Considered The Potential Cost of Proceeding With the Override or Compare Such Costs to the Benefit of Performing the Protested Contracts**

The third factor of the Reilly's test requires an agency to fully consider how the potential cost of proceeding with the override, specifically the costs associated with the possibility that GAO sustains plaintiff's protest, balance against the benefits associated with proceeding to perform the protested contract(s). Nortel, 84 Fed. Cl. at 250-51. NASA's treatment of the factor is insufficient. Again, NASA resorts to hyperbole unsupported by facts: "Proceeding with the override will help ensure that the ISS timely receives the critical cargo that it needs for its continued operation ... [and] also helps ensure that full crew complement is achieved [and] the ISS is maintained." Exhibit A at 6. First, there is little more than "wishful thinking" to support the premise that, by starting the CRS work 74 days earlier (rather than accepting the stay and allowing the GAO protest process to run its course), either SpaceX or OSC in fact will have any better chance of meeting the hopes that NASA has set for their ability to begin ISS resupply efforts, under the CRS contract, in December 2010 and October 2011, respectively. Second, NASA neglects its own planning, and many options, to provide necessary resupply in the eventuality that either or both CRS suppliers are delayed. Hence, the benefits of the override are speculative at best. In contrast, the adverse costs of the override are real and demonstrable. NASA admits to financial liability of $20,000,000 if the GAO overturns both the awarded contracts. These figures, however, reflect what NASA has acknowledged it "has *currently* funded" each of the awarded contracts. Exhibit A at 7 (emphasis added). Over the next 74 days,

or until the GAO rules, the *actual* amounts, as NASA may spend, may be much, much greater. NASA has not committed to any limit on early CRS funding – it only has made a statement of what already is "currently funded."

The merits of the PlanetSpace protest are not relevant here.  However, the relief sought, and the corrective action as may be recommended by the GAO, are important to assessment of NASA's compliance with the third <u>Reilly's</u> factor.  Specifically, PlanetSpace asserts that the award to OSC cannot stand as OSC received the lowest rating for "Mission Suitability" and proposed the highest price (by more than $600 million).  Should the GAO concur, it may recommend corrective action that displaces OSC entirely, in which case every dollar of CRS money that NASA spends while the stay is absent, is completely wasted.  NASA's evident determination, to open the funding flow to SpaceX and OSC notwithstanding a pending protest and the statutory stay, is especially troublesome in the context that (a) NASA awarded the second CRS contract to OSC despite it finishing last in the evaluation and proposing the highest price, and (b) the fact that both SpaceX and OSC are now receiving millions of dollars of NASA funding as they seek to *demonstrate* launch and mission capability under their COTS agreements.  A reasonable interpretation of NASA's actions is that the agency here "attempts to circumvent the competitive process by exactly the same type of action Congress intended the automatic stay provision of CICA to prevent." <u>Nortel</u>, 84 Fed. Cl. at 251.[8]

---

[8] NASA's maneuvers should be understood as intended to frustrate the GAO's ability to recommend any corrective relief that leads to award to PlanetSpace.  Ironically, through the override NASA increases its dependence of two unproven resources about whom, even in the Override Memorandum, NASA admits to many doubts. (<u>e.g.,</u> "Both contractors are proposing new launch vehicles and orbital vehicles." "The possibility of an early launch vehicle failure (a common development vehicle problem) or schedule delay is significant." Exhibit A at 3. "New space vehicle production is a high risk enterprise with a high probability of delay." <u>Id.</u> at 4.) On its face, NASA's proffered faith in these providers as the "only" timely answer to keep the ISS

24

### 5. NASA Does Not Actually Analyze The Impact Of The Override On Competition And The Integrity Of The Procurement System

The Override Memorandum also fails to meet factor (4) of the Reilly's test, which requires assessment of the impact of the override on competition and the integrity of the procurement system, as reflected in CICA. Contrary to NASA's suggestion, the decision to override the stay of the CRS contracts has damaged the integrity of the procurement system by undermining the purposes underlying the CICA-mandated stay. Such stays were established for several reasons, including, *inter alia*:

> Congress fully recognized that a major deficiency in the existing bid protest process was the inability to stop a contract award or contract performance while a protest was pending, observing that the result was that agencies . . . often proceeded with their contracts, simply ignoring the protest process. As a result, in those instances in which GAO recommended relief that involved staying performance, the agencies often rejected that recommendation, finding that it was in the "best interests" of the government to continue to contract . . . a key element of the [CICA stay was to] preclude such *faits accomplis* and to facilitate a fair and equitable remedy to vendors who are illegally denied Government contracts.

Reilly's, 73 Fed. Cl. at 710 (citations and internal quotations omitted).

The Override Memorandum, rather than actually engaging in an analysis of the impact of the stay override on competition and the integrity of the procurement system, simply states in a conclusory manner that the override "will not eliminate [PlanetSpace's] opportunity to compete for the effort should a re-competition be required in the event of any potential corrective action

---

functional, is dubious. Worse, if the GAO is positioned to accept selection of both SpaceX and OSC as a "fait accompli," then NASA has *excluded* the bidder (PlanetSpace) that has proposed to meet ISS resupply requirements through reliance upon the three companies, ATK, Boeing and Lockheed Martin, who collectively represent more than 150 years of successful accomplishment of NASA manned and unmanned spaceflight objectives. If NASA's true objective were assurance that ISS resupply would be secured from a CRS provider, then it would seem well-counseled to have "in the mix" the team that unquestionably has the experience and expertise to accomplish the requirements.

recommended by GAO." In making such a bare assertion, NASA failed to explain how the integrity of the procurement system was well-served through the override. It also failed to explain how SpaceX's and OSC's continued CRS performance would (or would not) place PlanetSpace at a competitive disadvantage if the GAO were to sustain PlanetSpace's protest and recommend a re-competition of the CRS contracts. In sum, the Override Memorandum was deficient on this fourth Reilly's factor as well.

For the foregoing reasons, NASA has failed to demonstrate that it has met not just one, but all four of the criteria for a valid CICA stay override as set forth in Reilly's Wholesale Produce. Thus, NASA's February 9, 2009 override decision is arbitrary and capricious, and PlanetSpace is likely to prevail on the merits. Apart from NASA's deficient analysis in issuing its CICA stay override, PlanetSpace is likely to prevail on the merits because any "urgent and compelling circumstances" that NASA may cite in support of its stay override decision, much like the procuring agency in Reilly's, resulted from NASA's lack of advance planning. See 73 Fed. Cl. at 715 ("many of the circumstances that [the procuring agency] now faces [in alleging urgent and compelling circumstances for a stay override] are the result of a "lack of advance planning"). Here, although NASA officials have publicly alluded to a multi-prong approach to resupplying the ISS, the fact that NASA has suggested in the Override Memorandum that the success or failure of the ISS Program rests only on the undisturbed performance of the CRS contracts is probative of its failure to have actually secured backup options to CRS. For example, although NASA may now permissibly procure Russian resupply services due to the September 2008 extension of the Nonproliferation Act waiver through 2016, it has admitted that there are currently no such agreements with Russia. Similarly, although PlanetSpace is not challenging the merits of the CRS contract award in this Court, if NASA had truly been

concerned about avoiding the "urgent and compelling circumstances" that allegedly resulted from the CICA stay, it could have engaged in better advance planning by having selected PlanetSpace as a CRS contractor.

### C.   Absent Temporary or Preliminary Injunctive Relief, PlanetSpace Will Suffer Significant and Irreparable Harm

"When assessing irreparable injury, the relevant inquiry in weighing this factor is whether plaintiff has an adequate remedy in the absence of an injunction." PGBA, 57 Fed. Cl. at 664.  It has long been held that the wrongful government action depriving a contractor of the "opportunities of the market place establishes the requisite 'irreparable injury' which no legal remedy would either value or redress." Id.

Moreover, PlanetSpace faces the prospect of injury that goes far beyond the potential loss of the opportunity to compete for the work that NASA improperly permitted SpaceX and OSC to continue performing by issuing the stay override.  By providing SpaceX and OSC with significant funding under the CRS contract (beyond the funding that they already receive under COTS), NASA ███████████████████████████████████████████ even if the GAO sustains PlanetSpace's underlying protest and either (1) recommends that NASA award a CRS contract to PlanetSpace or (2) conducts a re-competition of the CRS contracts.

First, by allowing SpaceX and OSC to perform their CRS contracts and receive tens of millions of dollars in funding beyond what they already receive through COTS, ███████
███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████.

See Declaration of Chirinjeev Kathuria ¶ 16 (Feb. 17, 2009) (attached hereto as Exhibit B).

Second, ████████████████████████████████████████████
████████████████████████████████████████████████████████
███████████ would significantly harm PlanetSpace going forward.  <u>Id.</u> ¶ 20.  Similarly, ██████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████, PlanetSpace would also suffer irreparable harm.
<u>Id.</u> ¶¶ 27-28.

Third, to the extent that SpaceX and OSC meet CRS milestones during the stay override,
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████.  <u>Id.</u> ¶ 22.

Fourth, NASA's decision to permit SpaceX and OSC to continue CRS contract
performance may lead █████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████.  <u>Id.</u>

Fifth, given the █████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████



██████████████████████████████████████████████████████

███████████████████████████████████████. Id. ¶¶ 25-26.

Sixth, and last, because SpaceX and OSC would continue performance on their CRS

contracts and receive tens of millions of dollars from NASA absent injunctive relief, ████████

██████████████████████████████████████████████████████

███████████████████████████████████████. Id. ¶ 29.  In this situation, ████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████████████████████. Id. ¶ 30.

██████████████████████████████████████████████████████

███████████████. Similarly, if GAO recommended a re-competition, ████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████████. Id. ¶ 31.

In short, the detrimental effects of *any one* of the aforementioned risks resulting from

NASA's stay override decision are more than sufficient to constitute irreparable harm to

PlanetSpace if injunctive relief is not granted.

**D.      Temporary or Preliminary Injunctive Relief Will Not Substantially Harm Either the Government or the Intervenors**

The harm to PlanetSpace, as described above, far outweighs any arguable harm to the Government, SpaceX, or OSC. If the development of CRS were actually delayed due to this Court's award of injunctive relief – and PlanetSpace respectfully submits that such delays are unlikely to occur due to NASA's continued funding to SpaceX and OSC under COTS – for reasons explained in the Statement of Facts and in Section B *supra*, NASA has a litany of alternative ISS resupply options at its disposal for dealing with any such short-term delays in the CRS contract.

Additionally, given the hurdles that either SpaceX or OSC must pass to be capable of an ISS resupply mission, the approximately 74 days of performance that NASA would obtain from an undisturbed stay override will not make any practical difference in the real-world ability of either SpaceX or OSC to supply the ISS. Thus, the award of injunctive relief here will not cause any meaningful harm to the Government. An award of injunctive relief to PlanetSpace may in fact benefit the Government by forcing NASA to improve its advance planning and engage in further efforts to secure ISS resupply alternatives.

Furthermore, because SpaceX and OSC benefited from a violation of CICA, they cannot be deemed to have suffered harm if the violation is corrected. See Al Ghanim Combined Group Co. v. United States, 56 Fed. Cl. 502, 520 (2003) (when an award process is flawed, an awardee is not harmed when an injunction prevents the awardee's performance).

**E.      Awarding a Temporary Restraining Order and Preliminary Injunction is in the Public Interest**

As this Court's discussion of the legislative history in PGBA makes clear, Congress has determined that the public interest is best served by maintaining a vigorous bid protest regime,

30

preserved and buttressed by the automatic stay provisions.  See PGBA, 57 Fed. Cl. at 660 & n.8.

In CIGNA, this Court went even further by determining that the Congressional mandate for

competition is a relevant factor in an override decision and that the procuring agency there erred

by failing to take it into account when it decided to override the automatic stay:

> Nor did the override decision consider the statutory mandates for competition in
> both CICA and the [new Medicare law] and the adverse effect on competition that
> the override could effect.

CIGNA, 70 Fed. Cl. at 102.

In its decision to override expressly the CICA-mandated stay of the CRS contracts,

NASA likewise failed to give any real consideration to the issue stated above.  Hence, award of a

temporary restraining order and preliminary injunction, to restore the CICA stay, is in the public

interest.

31

## CONCLUSION

Because NASA's decision to override the CICA-mandated stay of performance on the CRS contracts lacks the requisite justification, PlanetSpace is likely to prevail on the merits of its contention that NASA's actions are arbitrary, capricious, and contrary to law.  Absent injunctive relief, continued performance on the CRS contracts would inflict further irreparable harm on PlanetSpace beyond the harm that it has already suffered.  By contrast, injunctive relief would cause no harm to NASA (which is already funding SpaceX and OSC through COTS) and may in fact benefit the Government by forcing NASA to engage in further efforts to secure ISS resupply alternatives and by preserving a genuine opportunity for PlanetSpace to satisfy NASA' ISS resupply needs.

Thus, PlanetSpace respectfully requests that this Court enter a declaratory judgment setting aside NASA's stay override decision.  Additionally, PlanetSpace requests that this Court issue a temporary restraining order preventing SpaceX's and OSC's continued performance of the CRS contracts pending the issuance of a preliminary injunction, as well as a preliminary injunction preventing performance of the CRS contracts pending final judgment.

Dated: February 18, 2009                     Respectfully submitted,


Of Counsel:                                  _____

Jack Y. Chu                                  Robert S. Metzger
**PILLSBURY WINTHROP**                       **PILLSBURY WINTHROP**
**SHAW PITTMAN LLP**                         **SHAW PITTMAN LLP**
1650 Tysons Boulevard                        725 South Figueroa Street, Suite 2800
McLean, VA  22102-4859                       Los Angeles, CA 90017-5406
                                             (213) 488-7437
                                             (703) 749-2257 (protected facsimile)

                                             Counsel for PlanetSpace Inc.