National Aeronautics and
Space Administration
NASA Headquarters
Washington, DC 20546



February 10, 2009

Contract and Procurement Law Group

David Ashen, Esq.
Deputy Assistant General Counsel
Office of the General Counsel
Procurement Law Control Group
U.S. Government Accountability Office
441 G Street NW
Washington, DC 20548

**Re: Protest of PlanetSpace, Inc., B-401016**
**Solicitation No. NNJ08ZBG001R**

Dear Mr. Ashen:

In accordance with FAR 33.104(c)(3), NASA hereby notifies the Comptroller General of its intent to authorize performance for contracts awarded to Orbital Sciences Corporation and Space Exploration Technologies, Inc. under the above-captioned solicitation. Please find attached a copy of the required determination. Notices to proceed with performance will be issued before close of business today.

Please contact the undersigned at if you have any questions at vincent.salgado@nasa.gov.

Sincerely,

Vincent A. Salgado

*Counsel for NASA*

cc: Joel Van Over, Esq.
Evan Wesser, Esq.
Richard Vacura, Esq.
David Churchill, Esq.
Kevin Dwyer, Esq.



Enclosure

**Determination to Continue Performance of International Space Station (ISS) Commercial Resupply Services (CRS) Contract after Receipt of Government Accountability Office (GAO) Protest**

This document serves as the justification to continue performance of the ISS CRS contract awards made on December 23, 2008, to Orbital Sciences Corporation (hereafter referred to as Orbital) under contract NNJ09GA02B, and Space Exploration Technologies (hereafter referred to as SpaceX) under contract NNJ09GA04B, after receiving a timely GAO protest.

In accordance with FAR 33.104(c), "the contracting officer shall immediately suspend performance, or terminate the awarded contract, except as provided in paragraphs (c)(2) and (3) of this section" when a timely GAO protest is received. These paragraphs state:

(2) In accordance with agency procedures, the head of the contracting activity may, on a nondelegable basis, authorize contract performance, notwithstanding the protest, upon a written finding that --
(i) Contract performance will be in the best interests of the United States (U.S.); or
(ii) Urgent and compelling circumstances that significantly affect the interests of the U.S. will not permit waiting for the GAO's decision.
(3) Contract performance shall not be authorized until the agency has notified the GAO of the finding in paragraph (c)(2) of this section.

In addition, Competition in Contracting Act (CICA) prohibits GAO from considering costs to the Agency or programmatic impacts when using a "best interests" justification. However, the GAO may consider such factors when fashioning a remedy in connection with an override based upon urgent and compelling circumstances.

This document includes a background section on the ISS CRS acquisition, a justification that demonstrates that urgent and compelling circumstances exist that significantly affect the interests of the United States, and concludes with a determination section.

## I. BACKGROUND

On April 14, 2008, the contracting officer issued the ISS CRS Request for Proposals (RFP) NNJ08ZBG001R with a past performance proposal receipt date of May 27, 2008, and technical and price proposals receipt date of June 30, 2008.

The scope of the ISS CRS effort includes the critical resupply of the ISS by performing the following tasks: delivery of the pressurized and/or unpressurized cargo to the ISS; and the disposal of cargo or return of cargo to NASA from the ISS (Standard Resupply Service, Contract Line Item number 0001). In addition, there are Non-Standard Services (CLIN 0002) and Special Task Assignments and Studies (CLIN 0003) that can be ordered to support the primary Standard Resupply Service. The scope of the ISS CRS

effort only involves the transportation or disposal of cargo; it does not include the transportation of human passengers.

The ISS CRS RFP was solicited as a Commercial Firm-Fixed Price, Indefinite Delivery Indefinite Quantity (IDIQ) procurement. The RFP stated that "NASA may elect to award multiple awards." The guaranteed minimum for any resulting contract(s) was 20 metric tons (MT) of cargo delivery. The total maximum contract value for each award was solicited at $3.1 billion. The period of performance for this acquisition is January 1, 2009, through December 31, 2015. This acquisition is a new, not previously performed, procurement for ISS cargo resupply services.

Five offerors submitted a Past Performance proposal (proposal volume IV) by the date specified in the RFP for the submission of Past Performance information. However, only three offerors subsequently submitted proposal volumes I, II and III. Volume I was the Offer Volume, consisting of the Offeror Representations and Certifications and proposed contract terms and conditions. Volume II was the Mission Suitability Volume which addressed the offeror's proposed technical, management, and subcontract business utilization approaches. Volume III was the Price Volume. The offerors that failed to submit all required volumes notified NASA of their intent to withdraw from the competition. The fully respondent offerors were Orbital, PlanetSpace Incorporated (PlanetSpace) and SpaceX.

On December 23, 2008, the Source Selection Authority, Mr. William Gerstenmaier, made his selection with the following detail in his selection decision. (The full source selection statement is included as an enclosure to this determination and outlines Mr. Gerstenmaier's full rationale). (Enclosure 1):

> In accordance with the RFP that states the Government will award a contract resulting from this solicitation to the offeror whose proposal represents the best value after evaluation utilizing a combination of mission suitability and price, I find that SpaceX and Orbital are the best value and select them to perform the ISS Commercial Resupply Services (CRS) Contract. My selection decision is based solely on and is wholly consistent with the selection criteria and evaluation framework, including the relative importance of the factors and subfactors as explained in the solicitation and is supported by the SEB findings that I identified as relevant and material to my decision.

The basic IDIQ contracts were awarded on December 23, 2008. In accordance with the solicitation, each of the two contractors was awarded the guaranteed minimum 20MT of upmass. Orbital was awarded 20 MT of pressurized customer cargo delivery. SpaceX was awarded 20 MT of pressurized customer cargo and 8.3 MT of unpressurized usable cargo capability. Initial task orders were issued to SpaceX for 12 missions for a total price of $1,589,261,925 and to Orbital for 8 missions for a total price of $1,885,450,000 on December 23, 2008.

PlanetSpace took exception to the selection decision and filed a GAO protest on January, 14, 2009. (Enclosure 2)

## II. JUSTIFICATION TO CONTINUE PERFORMANCE

The purpose of these contracts is to provide critical cargo resupply services to the ISS from the end of the Space Shuttle Program to the end of the ISS Program. The critical supplies are composed of air, water, food, clothing, medicine, spare parts and scientific experiments. The requirements stated in the RFP reflect the amounts of cargo the U.S. needs to transport to and from the ISS to meet its international agreement obligations and ensure the continued, safe operation of the ISS over the period of 2010 through 2015. As is explained further below, failure to provide these services would not only cause a reduction in critical crew size, but, moreover, this reduction in crew size could be seen as the U.S. failing to perform the commitments it made in the Inter Government Agreement (IGA) and subsidiary agreements ("The Agreement Among the Government of Canada, Governments of Member States of the European Space Agency, the Government of Japan, the Government of the Russian Federation, and the Government of the United States of America Concerning Cooperation on the Civil International Space Station." The IGA, and the Memoranda of Understanding between the U.S. and other countries in furtherance of the IGA form the foundation of the ISS partnership).

NASA considered authorizing performance of only one of the two contracts selected for the CRS procurement. However, NASA determined that the override must apply to performance of both contracts since both are required to meet the critical cargo needs of the ISS. Both contractors selected will provide the pressurized cargo which comprises critical food, oxygen, and consumables along with the other internal payload experiments that fill up the experimental modules. Reducing half of that capability (by going forward with only one contractor) would still impact crew size and on-orbit laboratory use. Most importantly, however, going forward with only one contractor significantly increases the risk to NASA and the probability of not having the critical cargo on orbit when required. The production schedule for both contractors is very compressed and very challenging as described below. Both contractors are proposing new launch vehicles and orbital vehicles. Having only one provider perform the CRS requirement, even for a limited time, greatly increases the adverse impact on NASA. The possibility of an early launch vehicle failure (a common development vehicle problem) or schedule delay is significant. Overriding performance of only one contractor also further delays the time that NASA is able to spread this risk among two contractors. Both contractors need the amount of time provided to reasonably have a chance to meet their delivery dates and provide the critical cargo to the ISS. Therefore, NASA has determined the best way to ensure the agency has the capability to resupply ISS after the retirement of the Shuttle is to override the automatic stay on both selected contracts, thereby enabling the contractors to continue with their already compressed production schedules.

### a. Significant Adverse Consequence

NASA is responsible for providing cargo services to the ISS under its International Agreements as specified in the IGA and Implementing Arrangements, such as in the Balance of Contributions Agreement. On January 14, 2004, President Bush announced a U.S. Space Exploration policy which mandated the retirement of the Space Shuttle in 2010, but did not relieve NASA from the obligation of providing ISS cargo services for not only the U.S. but also for the other ISS partner nations.

The ISS Program is a partnership of 15 countries formed to build and operate a manned space station in low Earth orbit. To date, the partner nations have invested tens of billions of dollars over 15 years of effort. On-orbit today is over 610,000 pounds of structure stretching 308 feet in width and 243 feet in length, and containing over 10,600 cubic feet of habitable volume. During the 2008 calendar year, the ISS laboratory space and facilities were tripled when the European Space Agency's Columbus and the Japan Aerospace Exploration Agency's Kibo Experimental modules joined NASA's Destiny Laboratory on-orbit.

To support the research in and standard maintenance of these new research facilities, the full time crew of the ISS is scheduled to increase from 3 to 6 in May 2009 when the ISS will reach full operability. This increased crew size is critical to the continuing performance of research and maintenance in these new international research facilities. If NASA cannot provide cargo transportation, the U.S. cannot meet its obligation to its IPs to support and use the ISS for science, technology and research.

NASA currently is meeting this critical cargo transportation need through the Space Shuttle program, and the future plan for NASA to meet this critical cargo transportation is through these contracts as the cargo successor to the Space Shuttle, the CRS program. The procurement was accelerated to accommodate the lead time that NASA realized a CRS provider would need to be able to reliably provide services to the ISS. The production cycle for resupply spacecrafts is approximately 24–27 months as indicated by industry in the Request for Information responses (August 2007) and confirmed by the offerors in their proposals (June 2008). Accordingly, NASA must authorize performance for CRS services immediately in order to meet the required launch dates.

New space vehicle production is a high risk enterprise with a high probability of delay. NASA chose to award to two contractors as a way to mitigate this risk and maximize the probability that the critical cargo is delivered. Both CRS contractors, Space X and Orbital, are producing new launch and new orbital vehicles. The normal production cycle for mature launch vehicles is 27 months. The current timeline for the first Space X mission is December 2010, which is less than 24 months from now. The first Orbital launch is October 2011 but they are not as far in their development cycle as is Space X. A 100 day delay due to the automatic stay will result in a direct and adverse impact on this crucial timeline and will impair the ability of the CRS contractors to meet either of their mission dates.

As stated earlier, the CRS contractors are working under a tight schedule. A 100 day delay represents a loss of almost 15% of the preparation time for an already compressed

schedule. During this initial period both contractors will be making critical technical and business decisions to enable them to meet this challenging schedule. Critical initial activities under the CRS awards for the first 100 days include detailed mission integration planning, development of software, development of qualification data, capital equipment and long-lead item purchases. The procurement of long lead subcontracted components includes, but is not limited to, the pressurized cargo module, propellant and pressurant tanks, subsystem components, RF transceivers, and thrusters. Also, the 100 day delay prevents concurrent procurements of long-lead components, and therefore increases the costs of the missions. For example, it is more economical to make concurrent orders propellant tank dome forgings for two flight spacecraft than it is to make two separate orders for the forgings for individual spacecraft. As such, a delay of 100 days will result in a delay to the mission, cost increases or a massive effort to expedite activities once the protest is concluded. A massive effort to expedite activities to meet the December 2010 launch will be extremely difficult to achieve because the CRS contractors cannot expedite the acquisition and production of long lead items critical to both mission operations and launch of the cargo vehicles. Failure to meet the launch date will result in a failure to resupply the ISS with mission critical cargo, a situation which is unacceptable.

As detailed above, the critical cargo is composed of air, water, food, clothing, medicine, spare parts and scientific experiments for use in the U.S. and IP experimental modules. Regular transportation of experiments and laboratory supplies (from test tubes and living cells to metal alloys for testing) and return of samples (from blood, to fixed cells, to air and water samples necessary to confirm the health of the environment for the crew), as well as crewmembers to perform the tasks are required to conduct on-orbit research. Timely delivery of critical ISS system spares is required to keep the basic laboratory safely operating in space. The impact of not having the critical cargo is that NASA would have to drastically reduce the ISS crew size to a skeleton crew, and reduce maintenance of the ISS on-orbit vehicle to minimal "housekeeping", and the brand new experimental facilities will be unutilized.

Any delay will also mean the U.S. will not be able to fulfill its international agreements and such a failure would adversely impact the future of further international space exploration initiatives. Finally, the ISS's life as a research facility is currently limited to 2015. The International Partners have just launched their modules and are expecting a return on their considerable investment through the production of research in their modules. If the modules go unutilized, this research will not be conducted, the facilities will not be used, and the sunk cost of the facilities will not provide the benefit for which they were developed. There is no way to recover the lost research time and use of those facilities.

**b. Reasonable Alternatives**

No reasonable alternative sources exist to meet NASA's requirement to resupply the ISS once the Space Shuttle retires. The CRS contracts procured 40 MT of pressurized customer cargo and 8.3 MT of unpressurized usable cargo capability to be delivered to the ISS over the life of the contracts. This cargo amount is the remaining requirement

left after the ISS IPs have provided their bartered vehicles. NASA's IPs will be providing the Automated Transfer Vehicle (ATV), the cargo vehicle provided by the European Space Agency (ESA), and the HII Transfer Vehicle (HTV), the cargo vehicle provided by the Japanese Aerospace and Exploration Agency. These vehicles are important to the ISS but are not sufficient to meet the cargo support needs of the ISS. Seventy percent of the ISS cargo needs will be met by CRS.

In the past, NASA has used Russian vehicles to resupply the ISS when the Space Shuttle was grounded; however, at that time NASA had agreements in place which enabled it to use these Russian vehicles as an alternative source. NASA does not have any such agreements in place with Russia at this time to use its vehicles to resupply the ISS with cargo. Moreover, the current Russian infrastructure is not able to support our production needs and therefore we would need to invest in expanding their capability. This would, in effect, be supporting the Russian launch infrastructure and ultimately foregoing development of U.S. capability. This is not consistent with NASA's commitment to Congress to support domestic commercial space efforts and contrary to U.S. space policy which mandates support for domestic commercial space transportation capability, and thus this is not in the best interests of the United States.

Finally, it is not practical to procure Russian vehicles and have them available to support NASA's needs. NASA's experience has been that Russian contracts take 9 – 18 months to negotiate and their vehicle's production lead time is at least 24 months. Beyond the production concern, the contract would require a waiver to the Commercial Space Act of 1998 allowing procurement of the Russian services because there is no domestic capability of providing resupply services to the ISS. With the current contract CRS awards, it would be difficult to make a case for a waiver. Accordingly, pursuing additional cargo delivery through its Russian partner is not considered a viable alternative consistent with existing U.S. space policy.

Given these facts, there are no other reasonable alternatives to providing this critical cargo service.

c. Cost-Benefit Analysis

NASA has considered the costs of proceeding with the override, including the costs associated with the potential that the GAO may sustain the protest, compared to the benefits associated with this approach, i.e. avoiding the adverse consequences of delaying the program. The benefits to NASA are to avoid the adverse circumstances listed above. Proceeding with the override will help ensure that the ISS timely receives the critical cargo that is needed for its continued operation, i.e., air, water, food, clothing, medicine, spare parts and scientific experiments for use in the U.S. and IPs' experimental modules. Proceeding with the override also helps ensure that full crew complement is achieved, the ISS is maintained, and experimental facilities that the IPs and the US have spent billions of dollars on are used during the limited lifespan of the ISS.

Additionally, in considering the costs of proceeding with the override, NASA has considered the potential costs of terminating one or both of the CRS contracts in the event that the GAO were to sustain the protest and recommend termination of one or both contracts. NASA has currently funded each of the awarded contracts to $10M through May 2009. If GAO were to sustain the protest, the government's potential termination liability would amount to $10M if one of the two awarded contracts is overturned, and close to $20M if both are overturned in addition to protest costs.
NASA has also considered the programmatic impact of an adverse ruling from GAO that may include a recommendation to restart the competition with an attendant significant impact on schedule. While unlikely in view of the adverse consequences stated above, NASA acknowledges that such a recommendation would result in significant negative consequences to the ISS program. On balance, while acknowledging that the probability of an adverse ruling from GAO is uncertain, these potential costs are outweighed by the benefit to NASA of avoiding the adverse consequences delineated above and allowing the agency to execute its best and likely only chance to meet with its ISS-related international obligations and to take advantage of the ISS's limited lifespan.

d. Impact on Competition and the Integrity of the Procurement System

NASA recognizes that the overarching goal of the automatic stay is to preserve competition in contracting and to ensure a fair and effective process at the GAO. The agency also recognizes that the override provision in the Competition in Contracting Act (CICA) is an integral part of the federal procurement process. Its purpose is to address circumstances that the Congress anticipated, such as in the instant case, where an agency will necessarily face adverse consequences if performance is stayed. NASA also recognizes that the US Court of Federal Claims has established that agency overrides of automatic stays are subject to judicial review, thereby ensuring against abuse of this authority. On balance, NASA has concluded that the benefits of avoiding the adverse consequences to NASA, and specifically the ISS program, as set forth above, outweigh the impact on the procurement process and potential monetary and programmatic consequences of overriding the automatic stay.

Some may assert that proceeding with an override will limit the remedies available to the protester should it prevail on the merits. NASA also understands the CICA direction that a decision by GAO to resolve a protest will not be influenced by the agency's decision to override the automatic stay, and recognizes that a GAO decision could require re-competition. The agency has taken this into account and notes that proceeding with performance, in this situation where the agency is beginning a new effort, will not eliminate the protester's opportunity to compete for the effort should a re-competition be required in the event of any potential corrective action recommended by GAO.

**III. DETERMINATION**

In summary, after the Space Shuttle is retired, the CRS contracts represent the primary source of cargo transportation over the remaining life of the ISS. This critical cargo transportation ensures the ability of the ISS to retain the full complement of on-orbit crew members, perform critical research, maintain the ISS vehicle, and live up to the U.S. international agreements and obligations. The ability to perform research is the primary reason that the IPs have made their significant investment to the U.S. on-orbit laboratory partnership.

Based upon the above considerations, it is hereby determined that urgent and compelling circumstances exist that will significantly and adversely affect the interests of the U.S. unless the agency authorizes contract performance, notwithstanding the protest. Accordingly, the agency will notify GAO of this finding and will issue notices to proceed with performance of the awarded contracts to SpaceX and Orbital.

9 Feb 2009

William P. McNally
Assistant Administrator of Procurement
National Aeronautics & Space Administration

9 Feb 2009

William H. Gerstenmaier
ISS Cargo Resupply, Head of Contracting Activity
Associate Administrator
Space Operations Mission Directorate
National Aeronautics & Space Administration

2 Enclosures