PLANETSPACE, INC.,              )    **REDACTED**
                                     **VERSION**
            Plaintiff,          )

                                )

v.                              )    Docket No.:   09-99C

UNITED STATES,                  )

            Defendant.          )

                        Courtroom 9, Room 310

                        National Courts Building

                        717 Madison Place, N.W.

                        Washington, D.C.

                        Friday,

                        February 20, 2009

            The parties met, pursuant to notice of the

Court, at 10:06 a.m.

            BEFORE:   HONORABLE ROBERT H. HODGES, JR.

                        Judge

APPEARANCES:

For the Plaintiff:   (Via Telephone)

ROBERT S. METZGER, Esquire

Pillsbury Winthrop Shaw Pittman, LLP

725 South Figueroa Street, Suite 2800

Los Angeles, California   90017

(213) 488-7437

Also For the Plaintiff:

JACK Y. CHU, Esquire

Pillsbury Winthrop Shaw Pittman, LLP

1650 Tysons Boulevard, 14th Floor

McLean, Virginia   22102-4859

(703) 770-7674

```
 1        APPEARANCES:   (Cont'd)
 2              For the Defendant
 3
 4              WILLIAM P. RAYEL, Esquire
 5              STEVEN M. MAGER, Esquire
 6              U.S. Department of Justice
 7              Civil Division
 8              Commercial Litigation Branch
 9              1100 L Street, N.W., Room 12100
10              Washington, D.C.  20530
11              (202) 616-0302 / 616-2377
12              For the Agency:
13              VINCENT A. SALGADO, Esquire
14              National Aeronautics and Space Administration
15              Office of the General Counsel
16              300 E Street, S.W.
17              Washington, D.C.  20546
18              (202) 358-2050
19              For the Intervenor, Orbital Sciences Corp.:
20              AMY L. TENNEY, Esquire
21              KEVIN C. DWYER, Esquire
22              Jenner & Block, LLP
23              1099 New York Avenue, N.W., Suite 900
24              Washington, D.C.  20001
25              (202) 639-6000
26              For the Intervenor, SpaceX:
27              RICHARD J. VACURA, Esquire
28              KERIC CHIN, Esquire
29              Morrison & Foerster, LLP
30              1650 Tysons Boulevard, Suite 400
31              McLean, Virginia  22102
32              (703) 760-7764
33              Also For the Intervenor, SpaceX:
34              ROBERT A. SALERNO, Esquire
35              Morrison & Foerster, LLP
36              2000 Pennsylvania Avenue, N.W.
37              Washington, D.C.  20006-1888
38              (202) 887-6930
```

1                    P R O C E E D I N G S

2                                        (10:06 a.m.)

3                    THE CLERK:  All rise.  The United States

4      Court of Federal Claims is now in session, the

5      Honorable Robert H. Hodges presiding.

6                    THE COURT:  Good morning.  Be seated,

7      please.  Thank you.  All right.  Good morning

8      everyone.  We're on the record.  Mr. Metzger, would

9      you introduce yourself and your colleague?  Oh, Mr.

10     Metzger is on the phone.  I'm sorry, you're Mr. Chu.

11     Is that right?

12                   MR. CHU:  I am Jack Chu from our office in

13     Northern Virginia, Your Honor.  I am calling in from

14     California.  We are with the firm of Pillsbury

15     Winthrop, and we are representing Planetspace, the

16     Plaintiff Petitioner in this action.

17                   THE COURT:  All right, thank you and

18     welcome.  And the Defendant, the United States, Mr.

19     Rayel, is that correct?

20                   MR. RAYEL:  Yes, Your Honor, I'm William

21     Rayel for the United States.  With me is Steven Mager,

22     also from the Department of Justice, and Vincent

23     Salgado from NASA.

24                   THE COURT:  Well, welcome to you all.  Thank

25     you.  I can tell Mr. Churchill is not here.  Ms.

1   Tenney?

2            MS. TENNEY:  Yes, good morning, Your Honor.

3   I'm Amy Tenney from Jenner & Block.  Mr. Churchill is

4   out of the country and wasn't able to make it back in

5   time for the hearing today.  He extends his apologies.

6            THE COURT:  Well, no problem.  Give him my

7   regards.  And Mr. Vacura, is that correct?

8            MR. VACURA:  Yes, Your Honor, Richard Vacura

9   with Morrison & Foerster for SpaceX, or Space

10  Exploration Technologies Corporation, commonly called

11  SpaceX.  With me in the Court today are Robert Salerno

12  and Keric Chin, who are also with Morrison & Foerster.

13           THE COURT:  All right.  Well, thank you very

14  much.  I appreciate your being here on short notice.

15  I don't know how important it is, the timing on this

16  case, but it sounded as though perhaps it would be

17  helpful for me to go ahead and rule on the issue.

18           I don't have a record of any sort, of

19  course.  I don't know whether anyone else does.  But

20  the cases in this general area speak in terms of

21  searching the inquiries under APA.  Obviously, we

22  can't have one of those.

23           My only view, in any event, is that the APA

24  standards we apply probably in this case are closer to

25  what the Supreme Court says we are not supposed to do,

1    which is to review the record with a glancing inquiry

2    into the facial reasonableness of the agency's stated

3    rationale.

4          That particular case, I admit I'm not

5    familiar with the facts.  But I assume it was a

6    substantive agency decision or ruling, as most of the

7    APA cases are.  I'm happy to be convinced to the

8    contrary.  But my impression is that our duty here on

9    a case like this of considering the override, it is in

10   fact more of a glancing inquiry into the facial

11   reasonableness of the agency's stated rationale.

12         Again, I'm happy to be convinced otherwise.

13   But what strikes me particularly if it's important

14   that we rule promptly.  It seems that that would be my

15   general feeling going into it.  I've probably had

16   cases like this in the past.  I don't recall one

17   exactly like this, frankly.  But this is the way it

18   strikes me on first review.  But as I say, I'll let

19   you folks convince me to the contrary if you like.

20         Who has the burden here?  Would the

21   Plaintiffs like to begin, Mr. Metzger?

22         MR. METZGER:  Yes, thank you, Your Honor; we

23   do have the burden.

24         THE COURT:  Go right ahead.

25         MR. METZGER:  I'm pleased to attempt to

1    carry it.  I think it's important to set the context

2    of the present proceeding.

3              The immediate question before the Court, as

4    I see it at least, is whether to grant temporary

5    relief in the form of a temporary restraining order,

6    so that the agency cannot permit performance of these

7    two controverted contracts until the Court has had

8    time to consider the agency record; receive the

9    pleadings and comments of the interested parties;

10   accept argument after that preparation, and then oral

11   on the merits of the preliminary injunction which we

12   seek.

13             The situation, in a nutshell, is that on

14   December 23rd, NASA announced a decision selecting two

15   companies, each of which are represented in Court

16   today, SpaceX and Orbital Sciences, to receive awards

17   to provide re-supplied services to the International

18   Space Station some years hence.  My client,

19   Planetspace, filed a final protest with the GAO on

20   January 14th.

21             Twenty-six days later, NASA advised that it

22   had made a determination in finding to override the

23   stay of performance of the contested contracts; but

24   notwithstanding the mandate of the Competition in

25   Contracting Act that the stay remain in place until

1    the GAO has sufficient time to consider the merits of

2    the protest, issue a decision, and recommend

3    corrective action, if any.

4              The GAO was notified of NASA's override on

5    February 10th; and on 18th, Planetspace filed the

6    present action in this Court.

7              What Planetspace seeks is not a decision on

8    the merits of its protest or the merits of the

9    underlying procurement action.  Those are before the

10   GAO.

11             What Planetspace does seek is a confirmation

12   by this Court that the GAO will have the time that it

13   needs to make a decision, and will not be limited or

14   constrained in that decision by expedience and ill

15   considered actions as the agency may take in the

16   interim to provide funding on contracts where one or

17   both may be set aside as a consequence of the GAO's

18   pursuit.

19             Our filing, as I mentioned, was made on

20   Wednesday.  It is accompanied by a memorandum

21   appointing authorities.  We believe that we made a

22   showing that temporary relief was appropriate, in

23   light of the standards that are applied by the rules

24   of the Court, as well as the cases of this Court.

25             We also have shown a number of aspects by

1    which Plaintiff's base would suffer irreparable harm

2    if temporary relief were not granted.  We come to the

3    Court today asking that the Court issue that relief --

4    not to make a final decision upon the wisdom of the

5    rationale that NASA has articulated that supported the

6    override; but rather, Your Honor, to be sure that on

7    this important procurement, that the Court has the

8    time to review the agency record, to consider

9    carefully the serious questions that we have raised in

10   our pleadings.

11           We hope that the Court will, within a period

12   of 10 days to two weeks, put all of the parties to the

13   task of, in our case, sustaining our challenge to the

14   override action; and in their case, attempting to

15   defend it.

16           I would draw the Court's attention --

17   although I'm sure it isn't necessary -- to the rules

18   of the Court of Federal Claims at Appendix C, Rule

19   515(a), in which it is required that the parties

20   consider whether and to what extent, absent the

21   temporary relief, the Court's ability to afford

22   effective final relief is likely to be prejudiced.

23   Our view on that point is straight forward.

24           The NASA determination, which we received

25   just a few days ago, indicates that the agency has

1    current intentions of funding SpaceX and Orbital

2    Sciences of $10 million each.  That may not be the

3    limit of what the agency spends on the contested

4    procurement.  But it is a significant amount of money,

5    especially when there was a stay in place for a month,

6    and there is a protest pending today.

7              Our concern is that the agency, through this

8    belated override termination, in fact, is trying to

9    accomplish exactly that which Congress sought to avoid

10   when, in 1984, in enacting the Competition in

11   Contracting Act, it emphasized the importance of the

12   stay on procurement as part of the bid protest

13   mechanism.

14             The lifting of a stay, Your Honor, is not an

15   action that should be taken lightly by any agency; and

16   certainly is not one to be countenanced by a reviewing

17   Court, this Court, without a great deal of care.

18             There have been a number of override

19   decisions rendered by the Court of Federal Claims, as

20   the Court, of course, is well aware; and over the past

21   several years, a body of laws emerged, which many

22   judges in this Court have considered in looking at

23   override decisions.

24             Obviously, the question is whether the

25   override stance is ultimately determined under the

1    Administrative Procedure Act, as the Court recognized.

2    The question there, of course, is whether the Act is

3    arbitrary and capricious, an abuse of discretion, or

4    otherwise is not in accordance of law.

5         Beyond the general APA case law, however,

6    there are a series of decisions over the past several

7    years in the Court of Federal Claims, which add

8    considerable refinement to how the basic APA standard

9    is applied.

10        With respect, Your Honor, those cases

11    indicate that the override decision, because it comes

12    against a specific Congressional mandate, ordinarily

13    by this Court is viewed with certainly respect for the

14    agency's rationale; but with a degree of skepticism

15    that would be different than the standard that you

16    referenced of a glancing inquiry.

17        In fact, several years ago, in 2006, there

18    was a case, Reilly's Wholesale Produce, which we

19    mention in our filing, which attempted to articulate

20    four standards which are to be applied in the

21    determination of whether this kind of action, an

22    override of the CICA stay, is to be sustained or

23    overruled under the APA standard.

24        The four standards are first, whether there

25    is a significant adverse consequence that will

1    necessarily occur if the stay is not overridden.

2            The second standard is whether reasonable

3    alternatives to the override exist that would

4    adequately address the circumstances presented.

5            The third standard is how the potential cost

6    of proceeding with the override is, including the

7    costs associated with the potential that the GAO might

8    sustain the protest, compared to the benefits of the

9    approach that is being considered to address the

10   agency's needs.

11           The last standard, Your Honor, is the impact

12   of the override on competition and the integrity of

13   the procurement system.

14           Since the Reilly's Wholesale Produce

15   decision in 2006, there have been several further

16   decisions in this Court which have followed that

17   guidance; and more decisions than not which have

18   followed Reilly's Wholesale Produce, in fact, that

19   have overturned an override and, therefore reinstated

20   the stay that ordinarily is mandated by the

21   Competition in Contracting Act.

22           In our complaint, Your Honor, as well as in

23   the memorandum of points and authorities that we

24   offered into Court, we went to considerable lengths to

25   show that in this case that the override determination

1    of NASA did not satisfy any of the four factors that

2    were articulated in Reilly's Wholesale Produce.

3          That is noteworthy, Your Honor, because one

4    can fairly read the case law to indicate that the

5    failure of an agency to adequately consider even one

6    of those four factors is fatal to its ability to

7    sustain an override.

8          We argued that all four were unsatisfied.

9    We looked very carefully at the determination, and we

10   sought not only to criticize it as a matter of

11   rhetoric or advocacy -- and this is important -- but

12   to show that from the record of NASA's own conduct and

13   from statements made by NASA officials in testimony

14   made before Congress, that many of the things that are

15   said in the override determination are, in fact,

16   rebutted by the actions, conduct, and statements of

17   the agency that now says them.

18         For that reason, Your Honor, alone, I think

19   it's very, very important to put NASA through the

20   obligation to provide a record that will support the

21   many sweeping, dramatic statements that are included

22   in its override determination.

23         As I'm sure the Court recognizes, the

24   promise of the override determination is that the

25   International Space Station will not be supported; and

1    that the United States will fail to perform

2    obligations that it has to its international partners,

3    if the stay is not lifted and if two companies are

4    permitted to begin their performance 74 days earlier

5    than would have occurred if the GAO were permitted to

6    have all of the time it is allowed.

7            They also make some very dramatic statements

8    about the consequences to the ISS.  It makes very

9    dramatic statements about its inability to support the

10   station, other than through an accelerated performance

11   of these newly awarded contracts.

12           What we have shown in our papers, however,

13   is that these statements are largely speculative,

14   often exaggerated; that they are strained and over-

15   wrought, and that they are repeatedly contradicted by

16   facts and by NASA's own actions.

17           If it turns out that NASA has something

18   behind these dramatic statements, then they ought to

19   be able to provide that in the agency record.  I would

20   submit, Your Honor, that the Court has a very strong

21   interest in wanting to see that record and see whether

22   NASA can back up what it says.

23           If we were to allow NASA the benefit of the

24   override based only upon the determination that's

25   expressed through this override memorandum, we would

1     essentially be licensing an agency to say anything, to

2     have few limits in the bounds of its imagination, and

3     we would not hold them to the fundamental obligation

4     as it's been recognized by this Court that an agency's

5     override decision not only has to consider relevant

6     factors, but it also has to make findings in an

7     override determination that are consistent with and

8     not counter to the evidence before the agency.

9              And in this regard, Your Honor, I refer you

10    to the decision of the Court of Federal Claims in the

11    case of Nortel Government Solutions, which was decided

12    in 2008, again relying upon Reilly's Wholesale

13    Produce.  We have shown specific and multiple examples

14    of where NASA's override memorandum doesn't square to

15    the facts, and I think it is appropriate to ask NASA

16    to give us a record that supports what they claim.

17             Now turning to the individual elements under

18    the Reilly's Wholesale case --

19             THE COURT:  Excuse me, Mr. Metzger.  If you

20    don't mind, the Reilly standards, where did those come

21    from?  Is that sort of a compendium of cases in this

22    Court, those standards?  Normally, we don't make

23    standards here.

24             MR. METZGER:  Yes, Your Honor; I think that

25    is a fair characterization.  The Court in that case

1    looked at the history of override decisions; and

2    sought to find a way to extract and identify the key

3    factors in the prior decisions of this Court, which

4    had been employed in applying the APA review standard

5    to the particular question of whether a CECA override

6    was reasonable or not.

7            So Reilly's Wholesale Produce essentially

8    sought to give instructions to the Government and,

9    therefore, guidance in the form of precedent as to

10   what the Government would be expected to demonstrate.

11           Since that case was decided in 2006, it is

12   my belief, Your Honor, based upon my review of the

13   subsequent cases, that each of the later decisions of

14   this Court on override decision have elected to follow

15   that method of analysis and have made their

16   determination based upon the satisfaction or not of

17   those four factors.

18           THE COURT:  The statute, by contrast, merely

19   says essentially -- and I don't have the exact

20   language here -- that the agency makes a written

21   finding, and I assume that's some person in the

22   agency, a responsible person, that it's in the best

23   interests of the United States; and that urgent and

24   compelling circumstances require an override.  That's

25   all the statute says.

1          Normally, in a circumstance like that, it

2     seems to me where we have a non-substantive review, in

3     a sense, we are looking for arbitrary and capricious

4     actions by the agency.  It may be that's too simple.

5     But it seems to me that that's what we're accustomed

6     to doing in this Court.

7          The Really standards, given time, would be,

8     I'm sure, very important in trying to determine

9     whether the decision was arbitrary and capricious.

10    But I don't I know how much time we have.  If it takes

11    a couple of to resolve this; then the issue becomes

12    moot, in a sense.

13         MR. METZGER:  Well, Your Honor, I certainly

14    appreciate the terms of the statute.  But I understand

15    that the Court is looking to act in a fashion that is

16    both expedient and proper.

17         At the same time, you have to recognize that

18    the purpose of the TRO that we seek is to maintain the

19    statute quo, so that the Court will have the time --

20    and it is only a few weeks -- to consider the agency

21    record, and to allow the parties to brief the agency

22    record; and so that the Court can be fully familiar

23    not only with the positions of the interested parties

24    -- but also with the body of case law that's been

25    decided in this Court, as well as with the specifics

1    of the rationale that has been articulated by the

2    agency.

3         I have, Your Honor, had the occasion to do a

4    significant amount of work and review of cases decided

5    under the ACA; and I appreciate -- and I'm sure the

6    Court does, as well -- that, in fact, there is no

7    single standard or approach through to a decision.

8         But there are questions as to the extent,

9    the deference and the nature of the stay, and the

10   factors that the Court questions as to the nature of

11   the deference, the extent of deference, the nature of

12   review, and the particular factors that are to be

13   considered by a Court in different context as to the

14   application of the APA standard.

15        As I'm sure the Court recognizes, if the

16   only question illustration was whether performance of

17   the contract is in the best interest of the United

18   States, then there would be no subsequent case law of

19   any consequence; because the United States could

20   carefully infer that it wants the contract to be

21   performed, and it asserts that to do so is in its best

22   interests; then no outside party could have a serious

23   likelihood of correcting the United States from that

24   impression, if it's mere assertion were sufficient.

25        But the case law has not evolved that way.

1    In fact, in this area, you have to recall that

2    Congress made it absolutely clear in 1984 that it

3    expected that a stay would be imposed on procurement

4    during the pendency of a GAO protest; and that it was

5    only in the rare exception, only where an agency could

6    demonstrate urgent and compelling circumstances that

7    the stay should be lifted.

8         The cases that have followed have

9    consistently taken a careful approach to the

10   determination of whether the Government, in fact, has

11   proven urgent and compelling circumstances.

12        I very much appreciate, Your Honor, that

13   there are situations where the actions of the

14   Government are entitled to a high standard of

15   deference.  I will acknowledge that in cases before

16   your Court, some involving national security issues, I

17   have argued that certain types of actions or acts by

18   certain people do warrant a higher measure of

19   deference.

20        But the body of case law here, of which

21   Reilly's Wholesale Produce is just one example, is

22   consistent with being more demanding of the Government

23   than would be the outcome if only they would take a

24   glance and look at the rationale.  That would make it

25   too easy.  The agencies too often override what

1    Congress very clearly expected as the norm.

2            And in the circumstances present here, I

3    don't think it is the appropriate answer as a matter

4    of policy, as a matter of application of procurement

5    law, out of respect for the Office of Competition.

6            Also, again with respect, Your Honor, I

7    think that it would behoove the Court to take the time

8    that it needs, just a week or two, to make a

9    determination on a preliminary injunction; so that the

10   Court had the time to consider more fully the Reilly's

11   Wholesale case, the Nortel case, and the other

12   decisions that are consistent in establishing what is

13   now the prevailing standard of review of override

14   determination.

15           THE COURT:  Let me take this opportunity to

16   maybe get out of trouble with my clerk here, who

17   reminds me I was perhaps being a little bit facetious

18   at the very beginning when I suggested that the

19   standard is a glancing blow or whatever it was to make

20   a point, I guess.  I don't mean to suggest that that's

21   the standard I'm employing here.  So maybe that will

22   get me out of trouble.

23           But Mr. Metzger, you mentioned the interim

24   and the risk of things happening in the interim.  You

25   mentioned funding, for example.  What else might

1    happen in the interim that cannot be undone, if

2    necessary?

3              MR. METZGER:  I'd like to divide my answer,

4    Your Honor, into two parts.  The first part will not

5    make reference to any proprietary or competition

6    sensitive information.  The second part would make

7    reference to that information.

8              So when I come to the second part, may I ask

9    that the Court request individuals who are not

10   admitted under the protective order to leave the

11   Court, as there may be some in the courtroom?

12             THE COURT:  The issue of the protective

13   order --

14             MR. METZGER:  Well, what I will do, Your

15   Honor --

16             THE COURT:  -- certainly just let me know

17   when we get to that point, and we'll deal with that on

18   this end.

19             MR. METZGER:  What NASA has said it intends

20   to do is to permit these two companies to perform the

21   CRS contracts, which are intended to enable them to

22   perform re-supply missions to the Space Station some

23   years hence.

24             NASA has said that it has currently funded

25   these two companies, each in the amount of $10

1      million.  NASA has also given at least its impressions

2      of what the companies are going to do with this money.

3      They say that they'll engage in detailed mission

4      integration planning, and capital equipment and long

5      lead item purchases.

6                You talk about orders for cargo modules and

7      propellants and compression tanks and subsystem

8      components.  What I believe NASA intends to do, Your

9      Honor, is get the GAO into a small box where no matter

10     what the GAO decides about the merits of the

11     Planetspace protest, it won't feel it has any choice

12     other than to limit its correction action.  Because it

13     may recommend something other than displacing, Your

14     Honor, both of these companies.

15                When NASA says that it has current funding

16     of $10 million each, it does not, Your Honor, say that

17     that's the limit of the funding that it will make

18     available if the stay is lifted.  We have no idea what

19     that limit is.

20                NASA made much more than $20 million; and we

21     have to consider what they hope to have it spent for.

22     That's entering into contracts where things are going

23     to be billed, in some cases, overseas.  That will

24     certainly make it hard for the GAO to decide why not

25     to let that company have the contract.

1            The hazard here is that a great deal of

2      money is going to be spent; and that the practical

3      opportunity to offer any relief to the protest will

4      have been foreclosed because of what some people would

5      call the performance equity that will be gained.

6            In this case, it's not equity.  Simply put,

7      our protest asserts that NASA made various errors in

8      the procurement and that, Your Honor, both of these

9      companies are not entitled to the contracts which NASA

10     wishes that they now performed.

11           If we're right, and if just one of these

12     companies is displaced, then the consequence, Your

13     Honor, is that all of those items that the companies

14     may purchase will have to be canceled.  There will be

15     disputes.  The money that NASA spends will be lost,

16     and it will be wasted; and that makes no sense.

17           It makes no sense in this particular case

18     because, Your Honor, NASA's recommendation as to one

19     of the companies before you, that they received the

20     award even though the NASA evaluation team at the

21     Johnson Space Flight Center ranked the proposal of

22     Planetspace higher in its mission suitability; and the

23     price that my client proposed was half a billion

24     dollars or more, less.

25           So if we let the override remain in place,

1    NASA is going to pour money into the performance of

2    one company that we assert doesn't deserve to have the

3    contract and shouldn't; and that seems, to me, to be a

4    waste.

5            Moreover, NASA would have us believe that

6    accelerating the performance of these two companies by

7    lifting the stay is actually going to make a

8    difference in the ability of either to support the

9    Space Station.

10           That's a fairly incredible statement, when

11   one considers that neither of these companies have

12   actually flown the last vehicle that they would have

13   to use, years later.  None have actually flown the

14   orbital vehicle that would rendezvous with the Space

15   Station.

16           The first launch that SpaceX hopes to make

17   in December of 2010 under this contract was 22 months

18   away.  The first launch that Orbital hopes to make is

19   30 months away.  To a schedule, Your Honor, these

20   companies will have to have years of successful

21   efforts where not anything goes wrong with any of the

22   very challenging activities that are before them.

23           As we've said in our papers, Your Honor, the

24   history of development of space systems does not

25   warrant that confidence; nor does the actual

Page 24

1      experience of either Orbital and SpaceX and the

2      contracts they already have

3              THE COURT:  Well, let's see, those are merit

4      sorts of arguments, it seems to me, or it sounds like

5      it.  Other than, as a taxpayer and my being annoyed by

6      that waste of money, does it prejudice Plaintiff in

7      any way?

8              MR. METZGER:  Well, that's a very good

9      question.  If I may ask at this point if we could ask

10     persons who are not counsel, who are admitted under

11     the GAO protective order that would be admissible

12     under this Court's protective order, to leave, I will

13     address that.

14             THE COURT:  All right, you folks know who

15     you are that are not admitted.  This is my intern here

16     behind the Plaintiff's bench.  If no one has an

17     objection, I would --

18             MR. MAGER:  Your Honor?

19             THE COURT:  Yes.

20             MR. MAGER:  I believe all of the individuals

21     here are either attorneys; or in one case, from the

22     agency, from NASA.  However, I am not certain.  I do

23     not believe this Court has ruled with regards to the

24     admission of the various Intervenors under this

25     Court's protective order.

1          So it may be useful to first discuss the

2    admission of the Intervenors under the Court's

3    protective order.  Then in that case, I believe

4    everyone in the courtroom will be covered by the

5    protective order.

6          THE COURT:  Have we admitted the

7    Intervenors?  We haven't done that either.  Well, is

8    there any objection to that?  Is there any objection

9    to the Intervenors, Mr. Metzger?

10          MR. METZGER:  No, I have no objection, Your

11    Honor.  I did receive a communication early this

12    morning from counsel for SpaceX, Mr. Vacura, who said

13    that he thought that an in-house attorney for SpaceX

14    might be present.

15          I don't know whether that individual is

16    present.  But because of that possibility, I do feel I

17    should raise the question.

18          THE COURT:  All right, well, for the record,

19    we'll admit the Intervenors who are represented here,

20    whose names escape me for the moment.  But we'll issue

21    an order confirming that; and is there any objection

22    to their admission, to the protective order?

23          MR. METZGER:  No, Your Honor.

24          THE COURT:  And past counsel is the only

25    issue; is that right?

1           MR. METZGER:  Or any other business person

2     who might have a problem with Orbital Sciences or

3     SpaceX.

4           MR. VACURA:  Your Honor?

5           THE COURT:  Mr. Vacura?

6           MR. VACURA:  The in-house counsel for SpaceX

7     decided not to attend.

8           THE COURT:  Okay.

9           MR. VACURA:  So he's not present in the

10    courtroom.

11          THE COURT:  All right, so from what we can

12    determine here, the representation, at least, is that

13    everyone was clear; yes, ma'am?

14          MS. TENNEY:  One other item, Ms. Baldwin is

15    the courtroom.  She is a law clerk in our firm.  She's

16    not yet admitted to the Bar, so she's not admitted

17    under a protective order.  But she works at the law

18    firm.

19          THE COURT:  All right, do you have any

20    problem with that, Mr. Metzger?

21          MR. METZGER:  No.

22          THE COURT:  Okay.

23          THE COURT:  Nor do I; yes sir?

24          MR. RAYEL:  Just to clarify, I believe I

25    read the protective order as the standard one issued

Page 27

1   by the Court.

2           So technically, none of the attorneys here,

3   except for the Government people -- all the Government

4   people in the Court are actually admitted under the

5   protective order.  So the Court would have to make

6   both Plaintiff's counsel and Intervenor counsel.  We

7   don't have an objection to that.  I'd just note it for

8   the record.

9           THE COURT:  All right, thank you, for the

10  record.  We will admit Intervenor counsel and

11  Plaintiff's counsel to the protective order.  And

12  again, we will issue an order after the hearing

13  confirming that.

14          All right.  Well, thank you.  And go right

15  ahead, sir, Mr. Metzger?

16          MR. METZGER:  There are a number of discrete

17  elements of significant and irreparable harm that my

18  client would suffer if the override remains in place

19  and is not stayed.  The chairman of Planetspace, Dr.

20  Kathuria, has provided a declaration to the Court,

21  which is attached as Exhibit B to our memorandum in

22  support of application for a TRO, and it identifies

23  six distinct areas where Planetspace will be injured

24  if NASA begins on the performance of SpaceX and

25  Orbital Sciences on this disputed contract.





Page 29



Page 30

1

2          THE COURT:  Well, I must say some of those

3    reasons sound rather speculative and are rather

4    contrary to what NASA I believe has sworn here,

5    someone from NASA.  I don't know whether it's an

6    affidavit, but in any event, normally we assume that

7    government employees, like everyone else, act in good

8    faith here.  I would not want to just assume on the

9    basis of speculation that they're trying to mislead

10   the Court over there at NASA.

11          But it seems to me if we stick to the issues

12   that are mentioned in the statute, best interest of

13   the United States, now I agree with what I think you

14   were saying earlier, at least certainly the

15   implication of your comments were that that standard

16   is such that the agencies would always win if all they

17   have to do is say it's in our best interest and leave

18   it at that.  I see that problem.  And the fact is

19   apparently judges here have vacated stays or rather

20   reinserted stays.  So apparently it's not impossible

21   to do.  And the urgent and compelling circumstances,

22   that's the far more important one I think.

23          It seems to me, and I was a little bit

24   facetious there at the beginning talking about that

25   Supreme Court decision.  But it seems to me that

1    facially at least, in most of these cases, we have to

2    go along with what the agency swears to us, that these

3    circumstances are in fact urgent and compelling.  We

4    can look at the circumstances they say are urgent and

5    compelling and decide whether they strike us as urgent

6    and compelling I suppose.

7            But you see the problem here I guess, Mr.

8    Metzger, for a Court not having a record but merely

9    representations by the United States.  Some of the

10   reasons that you've just argued strike me as being

11   speculative.  You're worried about things that might

12   happen, in other words.  I don't know why the United

13   States, for example, would be particularly interested

14   in support a particular contractor for this job to the

15   extent that you would buy.  I don't believe that

16   either, but it doesn't strike me as being a conclusion

17   I would lead to.

18           But, in any event, I will give you another

19   shot at it, if you want, once we hear from the others.

20   If that's all right with you, I'll move on to the

21   United States, I guess.  Mr. Rayel, would you like to

22

23           MR. RAYEL:  Mr. Mager will

24           THE COURT:  I'm sorry, go right ahead, sir.

25           MR. MAGER:  Thank you, Your Honor.  Your

1    Honor, if it pleases the Court, at the outset, I would

2    like to focus again upon the standard for granting

3    injunctive relief and what a plaintiff needs to show,

4    because I do think that counsel for Planetspace is

5    straying somewhat from that. I don't know if he's

6    argued that the Court should grant the TRO. I simply

7    said that the Court can review the record and

8    determine if Planetspace's allegations have any merit.

9    Respectfully, that's not the standard which is

10   employed for granting a TRO. A TRO requires that

11   Planetspace be able to affirmatively demonstrate a

12   likelihood of success on the merits, irreparable harm,

13   that the stay would be in the public interest, and the

14   balancing of those harms.

15              THE COURT:  You're viewing this as a TRO

16   case?

17              MR. MAGER:  Well, they filed a motion for a

18   TRO and a preliminary injunction.

19              THE COURT:  Oh, I see.

20              MR. MAGER:  The standards for a TRO and a

21   preliminary injunction are actually quite similar.

22   But, consistent with PGBA, the government's position

23   is RF cases involving injunctive relief, ultimately,

24   you are seeking to stop the government from

25   performing.  And a couple of statements by

1    Planetspace's counsel are a little bit confusing.  The

2    contracts in this case have been awarded.  They were

3    awarded in December.  He's correct that a CICA stay

4    was put in place; but after notification to GAO, that

5    CIA stay is dissolved when the agency submits its

6    determinations and findings to the agency.  So,

7    currently, there is no CICA stay in place.  He's

8    argued some of the relief as though nothing has been

9    happening, whereas things have been happening since

10   well, since about eight days before they filed with

11   this Court, which was about the time the CICA stay

12   would have been dissolved.

13           THE COURT:  I'm sorry, say that again.

14   After the   the CICA stay dissolves automatically,

15   doesn't it?

16           MR. MAGER:  There is an automatic CICA stay.

17   That automatic CICA stay, by statute Congress

18   provided, can be overridden by an agency when they

19   show, in the case of a post-award decision, as this

20   is, either urgent and compelling circumstances or best

21   interest to the United States.  In this case, the

22   agency did issue its determinations and that CICA stay

23   is no longer in place and the agency has proceeded

24   with   or is proceeding currently with the contract at

25   issue.

1          Now, this Court then   the case law provides

2     that this Court, then, may review the agency's

3     override of the CICA stay; but the agency, at this

4     point, has already overridden the CICA stay.  Congress

5     basically   while it provided an automatic device to

6     suspend agency action, it also provided, expressly by

7     statute, an override mechanism for agencies, who find

8     themselves in urgent and compelling circumstances.

9          Obviously, pursuant to Ramcor, this Court

10    can review the agency's determination to override a

11    CICA stay and pursuant to Ramcor and Federal Circuit

12    precedent, that standard is arbitrary and capricious,

13    as this Court stated at the outset.  Reilly's

14    Wholesale does not and cannot change the standard of

15    review for this Court, nor does it purport to.  Some

16    statements by counsel for Planetspace seem to imply

17    that a new standard has been put in place.  But,

18    ultimately, that standard remains arbitrary and

19    capricious.

20          Further, it's worth noting that counsel for

21    the Plaintiff is incorrect to the extent he states

22    that this Court has consistently and always followed

23    the Reilly's Wholesale factors since they have been

24    issued by this Court.  While I do not have the full

25    review of the case law acknowledged, Your Honor, I do

1    know Management Solutions, a 2007 case by this Court,

2    did not use the Reilly factors in assessing, but

3    generally determined that    focused upon whether the

4    agency's decision lacked a rationale basis or violated

5    procurement regulation or procedure consistent with

6    the APA standards.

7              THE COURT:   But, I thought   didn't you say

8    something about the CICA stay dissolves?

9              MR. MAGER:   Yes.  The CICA stay can be

10   overridden when the agency issues its determination

11   and findings and then provides notice to the GAO that

12   it has issued its determinations and findings.  I

13   believe

14             THE COURT:   I do notice that and the CICA

15   stay is not in effect because of the override.

16             MR. MAGER:   The CICA stay is not in effect

17   because of the override.

18             THE COURT:   Right.

19             MR. MAGER:   That's why we're here.

20             THE COURT:   Okay.

21             MR. MAGER:   That's why we're in Court.  But,

22   there were some statements by counsel that I wanted to

23   clarify, because when he was talking about the

24   granting of injunctive relief and the standards for an

25   injunction, at times, he referenced the fact that   he

1    referenced that would really be made or that, you

2    know, a stay   when the stay will be lifted and the

3    fact is the stay has been lifted and an award has been

4    made in this case.  Award was actually made in

5    December.

6              In any event, addressing some more specific

7    allegations raised by the Plaintiff in this case.

8    They claim that their client would be irreparably

9    harmed.  Correctly, I believe that these harms are all

10   described as speculative. ███████████████████████

11   ████████████████████████████████████████████████

12   ████████████████████████████████████████████████

13   ████████████████████████████████████████████████

14   ████████████████████████████████████████████████

15   ████████████████████████████████████████████████

16   ███████████████████

17             They, also, of course, assert that the

18   agency is acting in bad faith.  As this Court is well

19   aware, the standard for demonstrating bad faith is

20   clear and convincing evidence and they come nowhere

21   near to meeting that in their declaration, especially

22   by simply alleging that they believe that the agency

23   is going to be and is acting in bad faith.

24   █████████████████████████████████████████████

25   █████████████████████████████████████████████

1 ████████████████████████████

2 ████████████████████████████

3 ████████████████████████████

4 ████████████████████████████

5 ████████████████████████████

6 ████████████████████████████

7 ████████████████████████████

8 ████████████████████████████

9 ███████████████  They have not demonstrate how

10 this would harm them, especially since the agency's

11 determinations has affirmed its commitment to abide by

12 GAO's decision, even to the extent that requires a re-

13 competition.  And it's worth noting that NASA has

14 and there is now showing NASA has ever not abided by a

15 decision by GAO.  Such a finding would be hard to make

16 since in the last 10 years, there are only five

17 instances in which an agency has taken exception to

18 GAO's recommendations.

19          In any event, it's also worth noting that

20 the Supreme Court stated in eBay v. Merc Exchange, a

21 2006 case, a Federal Circuit decision regarding the

22 Copyright Act, that it is improper for a court to

23 provide injunctive relief of presumed harm on the

24 basis of, in that case, potential loss of market

25 share, because in that situation, the Supreme Court

1    a scenario, in which injunctions always arise, much

2    like here, where to the extent that your competitor

3    sees a benefit, that circumstance will always arise

4    when the agency is proceeding with the contract.

5            Turning to success on the merits, engaging

6    the Claimant's presumption that this Court should be

7    looking at the Reilly factors, as Plaintiffs have

8    called them, even using those factors, the Plaintiffs

9    fail to demonstrate that they would be entitled to

10   relief.  The agency's determinations are based on

11   concrete realities that are acknowledged by the

12   Plaintiff, in their own filings.  Plaintiffs

13   acknowledge that there is risk within the schedule and

14   they acknowledge expressly that this is an aggressive

15   schedule.  Much of their finding focuses upon that

16   fact, a reality which confronted NASA.

17           It's also a reality that by presidential

18   policy, the space shuttle is to be phased out by 2010.

19   That's a matter of presidential policy and contrary to

20   what they assert in their pleadings, not a matter of

21   simply NASA policy or NASA decision to phase out the

22   space shuttle in 2010.  In their memorandum, they

23   mention there's a white paper by candidate   well, at

24   the time candidate Obama, now President Obama, that

25   talked about the possibility of extending the space

1    shuttle's mission.  But, to date, there is no

2    presidential policy that extends the space shuttle's

3    mission and this would require NASA to react on

4    speculation that now President Obama will do what he

5    stated   a potential intention to do when he was on

6    the campaign trail.  I don't like to say that it's

7    arbitrary and capricious to rely upon pledges made on

8    a campaign trail, but when there's a specific

9    presidential policy in effect, the agency is required

10   to follow that policy.  It is not arbitrary and

11   capricious to follow a policy, which has been set

12   forth by the President.

13            Neither would it be arbitrary and capricious

14   for this Court to follow Supreme Court precedent.  For

15   example, if on the Supreme Court five new justices

16   were appointed tomorrow and those five justices in law

17   review articles had speculated that they believe

18   Johnson Gravel was wrongly decided and this Court's

19   six-year statute of limitations is not jurisdictional.

20   The simple appointment of those five new justices to

21   the Supreme Court would not mean that this Court could

22   ignore the binding precedent that exists from the

23   Supreme Court.

24            Plaintiffs cite to several cases in their

25   brief, but they fail to note the critical distinction

1    between the cases they cite and this case, which is

2    those cases, such as Reilly's, such as e-Management

3    all involve a case where there was an incumbent

4    contractor rather than a new contract, which was going

5    into effect.  In those circumstances, the court held

6    in many instances that it would be arbitrary and

7    capricious for the agency to decide to proceed forward

8    with an override, when it had a contractor in place,

9    who was ready, willing, and able to perform that

10   contract.  We contrast the situation with a situation

11   that occurred in Alion, where the agency was moving

12   forward with  new contract requirements and the court

13   held that there was no incumbent and it was not

14   arbitrary and capricious for the agency to override

15   the stay in that instance.

16          In their briefs, Planetspace raises a number

17   of other arguments based upon speculation.  They talk

18   about how the agency might have been able to enter

19   into Russian agreements or might be able to enter into

20   Russian agreement.  Again, that's speculation at this

21   point.  And as the determination, itself, demonstrates

22   those agreements the agency looked at, looked at the

23   possibility of using Russian spacecraft for this

24   mission and ultimately determined that the length of

25   time to acquire those services would be lengthier than

1    proceeding forward with these contracts or indeed

2    proceeding forward with even Planetspace's contract.

3    There is nothing that they present that indicate that

4    Russia is a viable option.  And interestingly enough,

5    these assertions with regards to the reliability of

6    turning to Russia contradict a number of the

7    assertions that they have made in their filings at GAO

8    with regards to the reliability of Russia in speaking

9    of their competitors' proposals.

10            In any event, most of their memorandum

11    focuses upon policy disagreements and NASA's various

12    considerations in determining to focus upon commercial

13    space flight services.  In some senses, they're

14    seeking to burn down the house that they want to live

15    in.  But in any event, policy disagreements do not

16    have a place in this Court.

17            In any event, it's also worth noting that

18    the policy disagreements that they state and the

19    statements that they reference from other actors in

20    the government or from NASA are statements that often

21    predate the maturity of the CRS program at issue here.

22    The proposals  or NASA only received the proposals in

23    this case  the bulk of those was in June 30, 2008

24    with regards to a full schedule and a number of the

25    statements which they reference are from 2007, earlier

1    in 2007, and before even RFI responses had been fully

2    compiled and all of the relevant responses had been

3    compiled.

4              Turning to the other Reilly factors, it is

5    clear the agency did look at the cost benefit ratio.

6    We will acknowledge, of course, that there is a cost

7    and the determination does acknowledge that there is a

8    financial cost to the agency should GAO determine that

9    a re-compete will be necessary.  Put in context of the

10   entire program, the cost makes a lot more sense.  You

11   have, depending upon how you account for it, a $35 to

12   $100 billion space station, a $3.5 billion contract,

13   an expenditure of $10 million.  While $10 million is

14   nothing that the agency takes lightly, putting proper

15   perspective, it is only a portion of the cost, is the

16   cost necessary to get production moving.

17             Further, with regards to the impact on

18   competition, the fourth Reilly factor, as we noted

19   previously, the agency has said that it would abide by

20   GAO's determinations.  The agency's determinations

21   itself show respect to the Reilly factors and for the

22   need to consider the effect on competition.  The

23   agency carefully analyzed all of the factors in making

24   its determination.

25             There are two other prongs worth noting with

1    regards to the temporary restraining order or to the

2    grant of any injunctive relief.  One is the public

3    interest and the other is generally a balancing of the

4    harms.  In this case, the risk that exists is that

5    NASA will not be able to independently reach a space

6    station that it spent 25 years building.  The public

7    has an interest in a robust space program and the

8    development, use and encouragement of commercial space

9    flight.

10         Moreover, while they spent a portion of

11    their brief talking about NASA possibly turning to and

12    funding a Russian development, the Plaintiffs fail to

13    explain how it would ever be in the public interest

14    for the United States to be developing Russian rocket

15    capacity as opposed to American private commercial

16    enterprise.

17         At the end of the day, in balancing the

18    harms, the agency has listed specific concrete harms

19    to the agency.  Planetspace has listed speculative

20    harms, that they may suffer.  They also do not

21    demonstrate that these harms, in the event we are

22    talking about a TRO, would be incurred over the course

23    of 10 days, over 10 days in any specific instance that

24    they would suffer any specific harms.  For these

25    reasons, we respectfully request that the Court deny

1    Planetspace's motion for a TRO and preliminary

2    injunction.

3              THE COURT:  All right, thank you very much.

4              MR. MAGER:  Thank you, Your Honor.

5              THE COURT:  Let's see, the Intervenors,

6    would you like to say a few words?

7              MS. TENNEY:  Thank you, very much, Your

8    Honor.  Orbital agrees with all of the points that the

9    government has made and we won't repeat all of the

10   arguments that the government has made here.  But, I

11   did want to talk for a moment about that third factor

12   that Mr. Mager addressed about the balancing of the

13   harms.  Under the Reilly's opinion, intervenors are

14   also  the harms to intervenors may also be addressed.

15   And in this specific situation, given the urgency of

16   NASA's need to get to the space station after the

17   space shuttle is retired, Orbital will certainly be

18   harmed if Orbital is not able to actually go forward

19   right now, in terms of acting on the contract.

20             The schedule that Orbital proposed is

21   extremely aggressive.  Basically, at this point, what

22   we're dealing with is every day that the contract

23   might be delayed may result in at least one additional

24   day of delay and because of the urgency of getting to

25   the space station, we need to make sure that no

Page 46

1    further delay occurs.  For that reason, we would

2    respectfully join the government's arguments and ask

3    for the preliminary injunction and the TRO motion to

4    be denied.

5              THE COURT:  Okay.  Thank you, very much.

6              MS. TENNEY:  Thank you, Your Honor.

7              THE COURT:  Mr. Vacura?

8              MR. VACURA:  Thank you, Your Honor.  SpaceX

9    will also be brief and not surprisingly, we agree with

10   the government and the view articulated by Mr. Mager.

11   I would also, though, like to just focus on a couple

12   of the allegations in the briefs about harm to SpaceX

13   that I think the Court should also be aware of,

14   because some of the statements that are made in the

15   memorandum just are not correct.  They're factually

16   incorrect.  In particular, Planetspace argues, without

17   citing to any facts in the record, that there won't be

18   any adverse impact due to the delay that would be

19   caused by the stay, because SpaceX and Orbital are

20   being funded through another NASA program called COTS.

21   And they also allege that there is substantial overlap

22   between COTS and the contract at issue here, CRS.  It

23   is simply wrong and the Plaintiff provides no factual

24   proof for it, in its argument.

25              Under the COTS program, which is the

1    Commercial Orbital Transportation Services

2    demonstration program, SpaceX is performing work for

3    NASA in developing demonstration launch vehicles.

4    But, there is neither overlap nor do they directly

5    support the CRS planning and other CRS related

6    activities that would otherwise be scheduled to occur

7    during the pendency of the GAO protest.  It just

8    simply isn't true.

9              As counsel for Orbital said, the schedules

10   in this case for performing to the first launch are

11   extremely aggressive.  SpaceX's first launch required

12   by the contract is in December 2010.  And the

13   activities that SpaceX must engage in during the

14   period until a GAO protest is decided are extremely

15   critical to meeting that compressed schedule and to

16   having a successful launch in December 2010.  In

17   particular, there are activities that if SpaceX is

18   stayed from performance and cannot perform until the

19   GAO protest is decided in April will have a dramatic

20   impact on their ability to meet the schedule.  And

21   some examples of these are set out in the D&F that

22   NASA fully considered before determining to override

23   the stay and they include activities such as

24   purchasing long lead items that just simply take time

25   to manufacture and are extremely difficult to

1    accelerate.  So unless that activity is underway, the

2    schedule truly is jeopardized in December of 2010.

3            There is also studies, planning, and other

4    design work that needs to occur during this period

5    that is also very critical.  And, again, the

6    allegations that Planetspace makes, that this is

7    activity that is already occurring under the other

8    contract, the COTS program, is simply incorrect.  The

9    primary difference between COTS and the CRS program

10   here is that the CRS program requires carrying cargo

11   to the international space station and back and that

12   is very different from anything that's being done

13   under the COTS program, which, as I said, is a

14   demonstration program for the launch vehicle, itself.

15           One other point I would make, Your Honor, is

16   that as far as the primary argument that Plaintiff

17   makes, in terms of trying to claim that there would

18   not be adverse impact from continuing with the stay

19   and all of these various alternatives that they say

20   NASA failed to consider, one, that's wrong.  NASA

21   actually lists in the D&F other alternatives that they

22   considered, such as extending the shuttle, such as

23   obtaining launch services from Russia and so forth.

24   It's all laid out in detail in the D&F.  NASA

25   obviously considered it.

1          But the other aspect of that, that is

2     important for the Court to focus on, is those other

3     alternatives just aren't reasonable and that's really

4     what the law requires.  Even if you accept the Reilly

5     factors and other cases that have used the Reilly

6     factors, fundamental to the Reilly factors are that

7     other alternatives have to be reasonable and the cases

8     cited by government counsel reflect that.  In cases

9     that were   the stay was overturned, there were

10    incumbent contractors in place, so they were readily

11    available alternatives that were reasonable and the

12    government failed to consider them.  In cases that

13    counsel cited where the stay has not been overturned,

14    it's the alternatives that were available just were

15    not reasonable.  And here what Plaintiff would have

16    the Court do is accept the fact that NASA should have

17    entered into international agreements with Russia,

18    should have taken actions contrary to presidential

19    policy regarding the shuttle, and a host of others,

20    which are just speculative.

21          In the end, Your Honor, the facts that were

22    considered by NASA that are laid out in detail in the

23    D&F show deliberate, thoughtful, considerate action by

24    the agency and should not be overturned.  We

25    respectfully request that the Court deny the TRO.

Page 50

1    Thank you, Your Honor.

2                THE COURT:  Thank you, sir.  Anything else,

3    Mr. Metzger?  Mr. Metzger?

4                MR. METZGER:  I'm sorry.  Thank you, Your

5    Honor.  I would like to offer just a couple of

6    comments.

7                THE COURT:  All right, sir.

8                MR. METZGER:  First, I want to make it clear

9    that at no time has Planetspace asserted bad faith.

10   We have raised a challenge to the agency's action by

11   comparing statements of agency personnel in 2006 and

12   2007 and 2008 to the very different statements that

13   are made now.  I think that's a fair question, at

14   least meant to impugn the integrity of NASA.

15               But the issue before the Court is whether

16   NASA has made a sufficient justification to warrant

17   extraordinary action and that is to reject the

18   ordinary position of the stay and to let the GAO

19   proceed through is course.  That is what Congress

20   expected of NASA a month after our GAO protest was

21   filed.  They had already decided that it couldn't wait

22   the remaining 74 days and come up with a very dramatic

23   statement of there would be horribles and harms that

24   would be caused if these two companies are not

25   permitted to proceed.

1          Our view is that we are entitled to a TRO,

2     because, first, I think we have established the

3     probability of success on the merits.  We have raised

4     various arguments, not rebutted by NASA or Intervenors

5     in this argument, as to whether there is any necessary

6     adverse outcome that would occur with the stay that's

7     already installed.

8          On the question of the four factors,

9     certainly, we have shown that our client believes that

10    it will suffer serious injury.  The ultimate risk to

11    our client is that it will not be able to receive

12    corrective action from the GAO that would include

13    award of the contract and the loss of a contract of a

14    billion-and-a-half dollars or more at least to me is a

15    very serious injury, one that would be easily

16    qualified as irreparable.

17         There also is a public interest

18    consideration that ought to be respected and that is

19    that Congress has decided how protest processes do

20    proceed at the GAO and a stay is issued in the

21    ordinary course and only in the extraordinary course

22    should it be lifted and we don't believe that NASA has

23    made a sufficient determination.

24         I do want to mention a point that came up in

25    the government's comment and that was that NASA

1    considered many alternatives.  Well, I agree, NASA did

2    consider many alternatives and they have been actively

3    considering those alternatives for years, because,

4    simply put, there is no reason to rely upon the

5    ability of either SpaceX or Orbital to actually

6    perform the CRS missions on the schedules that are

7    indicated by that contract.  And I'm not saying that

8    in my own opinion, but that NASA has acknowledged that

9    in its determination and repeatedly in public

10   statements and testimony.  It is a very challenging

11   thing for companies to create whole new launch systems

12   from scratch and for the first time to fly orbital

13   vehicles and to do so in proximity to a manned space

14   vehicle and to do all of that in a period of just

15   several years.  For that reason, these two companies

16   have received nearly $500 million worth of contracts

17   from NASA to develop those vehicles and they have a

18   very long way to go before they have even successfully

19   tested the rockets or orbital vehicles, much less

20   qualify them to fly to the space stations.

21              From that sense, it borders on the

22   incredible, Your Honor, for NASA to ask this Court to

23   believe that if we don't add 74 days to the schedule

24   of Orbital Sciences and SpaceX, somehow NASA will have

25   no choice other than to abandon the space station.  It

1    truly is hyperbole.  But, it's not on the part of the

2    protestor or here the Plaintiff; it's on the part of

3    NASA.  It overstates the problem and it under-

4    recognizes what, in fact, are its alternatives.  NASA

5    has known and has planned for years this eventuality

6    that one or any of these CRS suppliers may not be able

7    to supply the space station as quickly as NASA hopes.

8              Finally, there was this question that Mr.

9    Vacura made as to what was being done on one contract

10   as opposed to another.  And I accept the clarification

11   that there is a difference in the work that was being

12   performed under this CRS contract, on the one hand,

13   and the work that's being paid for by NASA under the

14   preexisting COTS contract, on the other.  However, it

15   is really important to appreciate that in February and

16   March alone, Orbital Sciences will receive $60 million

17   under that COTS contract on development of a launch

18   vehicle that it will use for this new CRS contract.

19   And I believe in March, SpaceX will receive $15

20   million under the COTS contract.  But let's step back

21   one step further, if you please, and discern what

22   those monies are for.  Those monies, which will

23   eventually come to nearly $500 million, are monies

24   that are being paid by the government for each SpaceX

25   and Orbital to show that they actually can perform

1    this mission, which is the subject of CRS.  In fact,

2    if they suffer any delay or any problems or any

3    technical glitches, they are not going to be able to

4    meet the schedule under CRS because they will not have

5    a launch vehicle that is capable and qualified.  So,

6    it is a bit misleading to suggest that accelerated

7    performance on CRS would come out independent of what

8    is being done under COTS, because COTS is trying to

9    develop the hardware and if the hardware isn't

10   finished or doesn't work, then there's nothing to use

11   to perform CRS.

12            Finally, I would like to again ask the Court

13   to consider the state of the record and where we are.

14   Obviously, this is a serious matter.  Obviously, there

15   are very capable counsel involved.  Obviously, the

16   agency went to considerable effort, at least, to

17   prepare the determination and findings for the

18   override.  But today, as the Court said at the outset,

19   the only papers in front of the Court are the override

20   determination, itself, and the moving papers and

21   supporting materials from Planetspace.  What the Court

22   does not have is the agency record.  And as the Court

23   knows very well, of course, an APA decision is on not

24   a particular agency document, not a particular

25   determination, but it is on the record that supports a

1     particular agency action that is contested.  Our

2     proposition today really is a simple one.  We think

3     the Court should take the time and get the record and

4     allow the record to be briefed and then in a matter of

5     just a week or two make a decision on a preliminary

6     injunction, and in order to preserve the status quo

7     and give the Court the fullest opportunity to make

8     that decision without being prejudiced by money that

9     NASA is spending everyday, we think that a temporary

10    restraining order is prudent and justified.  Thank

11    you.

12              THE COURT:  Thank you, Mr. Metzger, and

13    thank you for getting up at what must be a difficult

14    hour to join us today.  If I had realized, somehow I

15    missed the fact that you were on the west coast, we

16    could have set it a little bit later.

17                    I am a little troubled I suppose by the

18    delay.  I don't know whether that is common in these

19    cases, but it strikes me that 26 days or whatever it

20    was, if it's that immediate and crucial that there

21    could have been some action before then.

22              MR. MAGER:  Your Honor?

23              THE COURT:  Yes.

24              MR. MAGER:  This is Steve Mager from the

25    United States.  If you wish, I could actually address

1     that.

2                   THE COURT:  Well, that's all right.  I was

3     going to say, though, that it's merely an issue that

4     strikes me, and I assume there is an explanation, but

5     I'm not sure that it has a legal effect anyway.  But

6     given that particularly, I can't ignore the fact that

7     this agency with expertise in the field represents to

8     the Court that, as the statute provides, that the best

9     interest of the United States are involved and that

10    urgent and compelling circumstances apply.

11                  I assume they acted in good faith, had no

12    reason to think that they did not in this case.  And I

13    haven't really heard anything other than speculation

14    or issues that go to the merits that persuade me that

15    I should get involved in this.  I don't view it as an

16    injunction case, as injunctive relief.  It may have

17    the same effect, the standards are different, but it

18    may be that the effect is the same.  But, I view it as

19    merely a review of an agency decision that's not

20    entirely substantive in the sense of a typical APA

21    case.

22                  And while it's true, as Mr. Metzger pointed

23    out, that Congress provided for this automatic stay,

24    it also provided for this override process and the

25    override process seems to have worked.  It seems ready

1   on its face and I don't feel that this Court should

2   get involved at this stage and I still do.  I deny

3   that motion and I will issue an order confirming the

4   petition, I guess it was, in the form of an injunction

5    I will issue an order confirming that ruling when

6   you get back and also the issues that you mentioned

7   earlier about the protective orders.

8              If anyone has any questions, I would be glad

9   to entertain those.

10             MR. METZGER:  Your Honor, if I may ask one

11  question.

12             THE COURT:  Certainly.  Yes, sir?

13             MR. METZGER:  Will you issue both as to the

14  application for the TRO, as well as the preliminary

15  injunction?

16             THE COURT:  Yes, yes, and I will make that

17  clear.  Frankly, I don't have the exact one of the

18  motion or the petition, but I will make that clear in

19  the order.

20             MR. METZGER:  If I may ask one further

21  question.

22             THE COURT:  Yes.

23             MR. METZGER:  We have also sought

24  declaratory relief and for purposes of declaratory

25  relief, the factors that are relevant to a TRO and

```
 1     preliminary injunction are not required.  Does your

 2     order extend also to declaratory relief?

 3                THE COURT:  Yes.  I think, in fact, that's

 4     what I meant to convey, that I view this as more of a

 5     declaratory action.  But, in any event, the effect is

 6     the same, I suppose.  If there are technical

 7     differences that we need to worry with, we'll deal

 8     with those in the order, as well.  In other words, if

 9     it makes a difference exactly what it is that I'm

10     denying and what the form is, then we'll be sure to

11     cover all of that, and I am sure you'll let me know if

12     we don't.  But, I will try to resolve that as quickly

13     as I can.  I'm aware, of course   I mean, I'm letting

14     you know of the ruling now, because I know that time

15     is of the essence here and I want you to have time to

16     plan, from all of your standpoints.

17                Thank you very much for joining us, and I

18     imagine we will be back in touch.

19                (Whereupon, at 11:42 a.m., the hearing in

20     the above-entitled matter was concluded.)

21     //

22     //

23     //

24     //

25     //
```

Page 59

1                   REPORTER'S CERTIFICATE

2

3    DOCKET NO.:  09-99C

4    CASE TITLE:  Planetspace, Inc. v. United States

5    HEARING DATE:  February 20, 2009

6    LOCATION: Washington, D.C.

7

8         I hereby certify that the proceedings and

9    evidence are contained fully and accurately on the

10   tapes and notes reported by me at the hearing in the

11   above case before the United States Court of Federal

12   Claims.

13

14                        Date:   February 20, 2009

15

16                        _____

17                        Christina Chesley

18                        Heritage Reporting

19                        Corporation

20                        1220 L Street, N.W.

21                        Washington, D.C.  20005